THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY D. CHARLESTON, Defendant-Appellant.

Second District   No. 2—94—0550

Opinion filed March 15, 1996.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of Elgin, and Robert J. Biderman and Perry Miller, both of State's Attorneys Appellate Prosecutor's Office, of Springfield, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Gary D. Charleston, appeals from the judgment entered on his conviction of aggravated discharge of a firearm in the direction of another person. We reverse.

Defendant was indicted on two counts of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(1), (a)(2) (West 1994)). Count I alleged that, on January 23, 1994, defendant knowingly discharged a firearm "into a building" which he knew to be occupied. Count II alleged that defendant knowingly discharged a firearm "in the direction of another person." The case was tried before a jury in April 1994. At the close of the State's evidence, the court granted defendant's motion for a directed verdict as to count I, finding that the State had produced insufficient evidence that defendant discharged a firearm "into a building." The court denied defendant's motion for a directed verdict as to count II, finding there was sufficient circumstantial evidence concerning that charge for the jury to consider.

The following morning, the court reconsidered its ruling on defendant's directed verdict motion. The court vacated its order granting a directed verdict as to count I, and reinstated that charge. The jury ultimately found defendant guilty of both offenses, but the trial court entered a judgment of conviction only as to count II, finding that the two offenses were carved from one act.

Defendant appeals from the judgment of conviction on count II, arguing that his conviction must be reversed because the evidence concerning the direction in which he was alleged to have discharged the firearm was insufficient to establish his guilt beyond a reasonable doubt. Defendant also argues that he was denied a fair trial where,

he asserts, the trial court erroneously vacated its order directing a verdict as to count I. Defendant contends that the trial court's error prejudiced the jury in rendering its verdict as to count II.

We summarize only those facts essential to an understanding of our disposition of the appeal. At trial, 19-year-old Teena Callahan, who lived in Zion, testified that she knew Larry Greenwood and that she had known Zipporah Hamlet since junior high school. Hamlet had introduced her to "G.C." (defendant) the day before they went for a ride in Greenwood's yellow Geo Tracker on the evening of January 23, 1994. "Bone" (*viz.*, Charles Galmore), who had also just been introduced to Callahan, was with defendant and Greenwood when they came to pick up Callahan at her apartment. Defendant was wearing yellow pants.

When they left for a ride to North Chicago, Greenwood was sitting in the driver's seat, defendant sat in the front passenger seat, and Galmore climbed into the rear seat behind Greenwood. Callahan sat in the rear center, and Hamlet sat in the right rear passenger seat behind defendant.

Defendant said something about a lady owing him some money, and defendant asked Greenwood to drive to Park Avenue. A few minutes later, Greenwood stopped the Tracker on Park Avenue, and defendant exited the passenger door side.

Callahan did not see where defendant went after he exited the car, but Callahan then heard two gunshots in succession. After she heard the shots, defendant got back into the right front passenger seat and told Greenwood to go. Greenwood drove off, and, about a minute later, police sirens were heard. A police car came up behind them, and Greenwood pulled the Tracker over briefly, but then Greenwood pulled away and the police began chasing them. Callahan was telling them to stop; she wanted to get out. A gun was thrown to the backseat from the front seat, but Callahan did not know who threw it. Someone asked her to grab the gun and throw it out. It was a small gun that could fit in the palm of a hand. A few blocks later, Greenwood pulled the vehicle over, and the police searched the vehicle and found the gun. Defendant was then arrested.

The following night, at about 2 a.m., Callahan was visited by Hamlet, Greenwood, and Hamlet's little brother. Hamlet said defendant's family was very upset when they heard that Callahan had made a statement that defendant had fired the gun. Callahan took the visit as a threat. Hamlet tried to persuade Callahan that she needed to say that Galmore had fired the gun. Callahan testified, however, that Galmore never got out of the car after defendant told Greenwood to stop on Park Avenue. She never saw Galmore in possession of a gun, nor did she see him use the car phone.

Galmore, who was 22 years old, testified that he lived in Waukegan and had known defendant for six years. Defendant's nickname was "G.C." Galmore knew Greenwood from high school. After picking up the women and Callahan's son, they got into the Tracker in the same positions described by Callahan. Galmore sat behind Greenwood, the driver. They drove to Waukegan and dropped off Callahan's son, and headed toward North Chicago. Defendant used the car phone, but Galmore could not hear what he was saying because the music was playing. After hanging up the phone, defendant told Greenwood to take him to a street in North Chicago. Defendant told Greenwood where to stop the vehicle, pointing to a big white house. Defendant got out from the front passenger side and no one else got out. While the others sat in the vehicle, they heard gunshots. Then defendant ran back to the vehicle, jumped in, and told Greenwood to "pull off."

After Greenwood pulled away, a police car came behind them. Defendant turned around to the backseat and told someone to grab the gun. Galmore saw the small, silver pistol in defendant's hand. Defendant dropped the pistol on the floor; it landed near Hamlet. After the police stopped the vehicle, defendant told Greenwood to drive away, and he did so. They were finally stopped by the police two or three blocks away. Defendant was wearing yellow pants; he had on a bright coat with yellow on it. Galmore did not wear yellow pants that night, nor was any other person in the vehicle wearing yellow.

Galmore did not know Bernetta Peterson. He had never been to the house on Park Avenue before January 23, 1994. He did not know Callahan. Defendant gave the directions to the house on Park Avenue. When defendant got out of the vehicle, he went across the street toward the house, but Galmore then lost sight of him after he crossed the street since Galmore was sitting on the driver's side. Defendant was breathing hard when he came back.

According to Detective Curtis Brame of the North Chicago police department, Galmore identified defendant as the person who discharged the gun.

Peterson, who resided at 1511 Park Avenue in North Chicago at the time of the incident, testified that on January 23, 1994, she had just arrived home after her mother dropped her off at about 10 p.m. The apartment house had two floors; Peterson used the side door to reach her upstairs apartment. She turned on the washroom light to let her mother see that she had arrived in the house safely. Peterson went to her front window facing Park Avenue and looked out to see if her mother was still there, but she did not see her. Peterson opened the window and stuck her head out. She saw a small yellow jeep

parked in the street and facing north. As soon as she stuck her head out the window, she saw a young black man jump out of the jeep from the passenger side. The young man crossed Park Avenue and ran across the yard where he started shooting. Peterson heard a total of three shots in succession. After hearing the first shot, Peterson hit the floor of her apartment, picked up the telephone, and called the police. While she was on the phone with the police, she heard someone coming up the steps and told the police, "He is coming in, he is coming in."

Peterson then heard sirens in the distance, and the person who was coming up the inside steps left. She stayed on the floor for awhile and then looked outside, but the jeep was gone. Peterson told police that the man she had seen running across the yard was wearing yellow pants and a dark coat with a bright colored design on it. When she was first asked by the police who that person might be, she could not say. After thinking about it, she recalled that, in December, she had been showing apartments in her building for the landlord and took deposits from those wanting to move in. She indicated that she took a $50 deposit from a young man with a tall, medium build whom she later identified as being defendant. Peterson indicated that, when she took the deposit, defendant had been accompanied by a short, heavyset man. In January, the companion came back and demanded the return of the money. Peterson told him she had been trying to reach defendant to return his deposit, but she would not give the money to the companion unless defendant approved.

Officer Timothy Ives of the North Chicago police department testified he was one of the officers who pursued the vehicle. After the vehicle was stopped, he arrested Larry Greenwood and searched the vehicle. He found a .22-caliber pistol which was located on the floor behind the front passenger seat. The pistol smelled of burned gunpowder. Officer Herbert Browne checked the pistol and found no live rounds of ammunition in it. Officer Lou Rossi found four live rounds in the vehicle. A couple of hours later, Officer Ives examined the area near the house, but he was unable to find any live or spent rounds of ammunition in or near Peterson's house. Officer Ives had no idea in which direction the shots had been fired. He returned the next day to examine the area, but again found no evidence of the shots that had been fired.

At the close of the State's evidence, the court granted defendant's motion for a directed verdict as to count I because the court found insufficient evidence that defendant discharged a firearm "into a building" which he knew to be occupied, but denied the motion for a directed verdict as to count II (firing of a firearm in the direction of a

person). The following day, the trial court reconsidered its finding, vacated the prior order which had granted defendant's motion for directed verdict as to count I, and reinstated the charge. The trial court reasoned that there had been a nonfatal variance of the evidence in relation to the charge, not a failure of proof. Defense counsel complained that he was not prepared to argue this particular point. Defense counsel later pointed out to the court that, because of the court's finding, he had not prepared a closing argument addressing both counts.

Defendant then presented his case. Hamlet testified that she spent the night with defendant at Callahan's apartment on January 22, 1994. The following evening, defendant and Greenwood came to the apartment, and they all went driving after dropping off Callahan's son with the baby-sitter. Hamlet testified that she was sitting in the middle of the backseat, Callahan sat behind the driver (Greenwood), and defendant was in the right front passenger seat. Galmore sat behind defendant. When they arrived at Park Avenue, defendant got out of the vehicle to let Galmore out. Defendant then got back in the vehicle. Then Hamlet heard what sounded like firecrackers. When Galmore came back to the vehicle he got in on the left side, and they drove off. Hamlet testified that she heard sirens and then they were pulled over about a block away. Galmore tried to pass a shiny silver object to her, saying that he had done something. Greenwood pulled over, but Galmore told Greenwood to keep driving. Neither Hamlet nor Callahan would take the shiny object. She never saw a pistol being thrown into the backseat, nor did she ever see defendant with a gun that evening. Hamlet testified that defendant was wearing yellow pants that evening.

Larry Greenwood testified that defendant got into his car that evening with another person, named Bones (Galmore), a person Greenwood said he did not know. Defendant asked Greenwood to take him up to Zion to pick up Hamlet. At Callahan's house, Callahan and Hamlet got into the back of the vehicle. Defendant was seated in the front passenger's seat, Galmore was behind defendant, Callahan was in the middle of the backseat, and Hamlet was behind Greenwood, who was driving. After dropping off Callahan's son, they drove around North Chicago. Defendant used the car phone, but Greenwood did not hear him speak to anyone. Galmore then asked Greenwood to take him over to Park Avenue because a lady owed him some money. When they arrived at Park Avenue, Greenwood stopped on the left side of the street. Defendant let Galmore out and then got back in the car. Greenwood did not see where Galmore went. Galmore was wearing black pants and a black and brown coat.

Greenwood heard two shots, and Galmore quickly returned to the vehicle. Defendant, however, would not open the door to allow Galmore back in the vehicle. Galmore came around to the driver's side, and Greenwood opened the door and let him in. Galmore was then sitting behind Greenwood. Greenwood drove off. He heard sirens but kept going because he did not think there was anything wrong. Greenwood began to pull over after seeing the police, but Galmore told him to keep going and said he had a gun. Greenwood pulled over when he saw more police officers. Greenwood said that Galmore was trying to give the gun to Callahan, who was sitting in the middle backseat, but she would not take it.

The jury found defendant guilty of both offenses, but the court entered judgment only on count II (discharge of a firearm in the direction of another person). This timely appeal followed.

■ Defendant first argues on appeal that he was not found guilty beyond a reasonable doubt of the offense charged in count II because the State failed to produce sufficient evidence with respect to the element that the firearm be discharged in the direction of another person. We must reverse a judgment of conviction "where the evidence is such that no rational trier of fact could have found a defendant guilty beyond a reasonable doubt because, taken in the light most favorable to the prosecution, the evidence is so palpably contrary to the verdict or the verdict is so unreasonable, unsatisfactory, or improbable as to raise a reasonable doubt of defendant's guilt." *People v. Gomez*, 215 Ill. App. 3d 208, 215-16 (1991).

To prove the commission of the offense in question, the State must show that the accused knowingly discharged a firearm, aiming it in the direction of another person. *People v. Hartfield*, 266 Ill. App. 3d 607, 608-09 (1994). Here, there was strong evidence that defendant discharged a weapon, but the evidence concerning the direction in which the shots were fired was lacking. Peterson did testify that shots were fired, but she did not indicate that the shots were fired in her direction or at the building itself. Further, none of the police officers who investigated the site were able to find any evidence that the shots were fired in the direction of Peterson or at the building. The jury was left to speculate whether defendant shot in the direction of Peterson (or in the direction of the building, for that matter). Looking at the totality of the evidence, we conclude there was insufficient evidence, whether direct or circumstantial, to support this element of the offense charged. Therefore, the judgment of conviction cannot stand. *Hartfield*, 266 Ill. App. 3d at 609.

■ In entering judgment on count II, the court indicated it would also have entered judgment on count I if that count were not

premised on the same conduct or if the judgment on count II were reversed. However, there is no possibility that a judgment on count I could stand. First, it was reversible error for the trial court to vacate its order directing a verdict for defendant. Following the State's case or at the conclusion of all the evidence, the granting of a motion to direct a verdict will ordinarily be deemed an acquittal so long as it is not the result of a sham trial; it may not be withdrawn by the trial court even if erroneously granted, irrespective of whether the ruling is based upon a mistake of fact or a mistake of law. *People v. Poe,* 121 Ill. App. 3d 457, 462-63 (1984); see *People v. Brown,* 227 Ill. App. 3d 795, 798 (1992); see also *People v. Mink,* 141 Ill. 2d 163, 179 (1990) (reconsideration of an order directing a verdict for defendant which exposes defendant to further proceedings devoted to resolving factual elements of the offense violates the prohibition against double jeopardy).

Second, the evidence concerning the direction in which defendant fired the weapon is equally insufficient to support a judgment of conviction on count I. To prove that charge, the State had to show that the gun was fired at or into a building which defendant knew to be occupied, and for the reasons discussed above, the evidence was insufficient to prove that defendant discharged the gun at or into the building.

For the foregoing reasons, the judgment of conviction must be reversed together with the resulting sentence. Defendant is hereby ordered discharged.

Reversed.

McLAREN, P.J., and DOYLE, J., concur.