THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES WILLER, Defendant-Appellant.

Second District   No. 2—95—0676

Opinion filed June 28, 1996.

Josette Skelnik, of Law Offices of Josette Skelnik, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, James Willer, of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(i) (West 1994))) and two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(b) (now 720 ILCS 5/12—16(b) (West 1994))). The trial court sentenced defendant to concurrent terms of imprisonment of 10 years for each count of aggravated criminal sexual assault and 5 years for each count of aggravated criminal sexual abuse. Defendant now appeals his conviction. We reverse and remand.

The following summary of the facts is taken from the record. On October 26, 1994, defendant was charged by indictment with one count of aggravated criminal sexual assault and two counts of aggravated criminal sexual abuse. Count I alleged that defendant committed the offense of aggravated criminal sexual assault against his daughter, M.W., by engaging in sexual intercourse with her when she was under 13 years old. Count II alleged that defendant commit-

ted the offense of aggravated criminal sexual abuse against M.W. by fondling her buttocks when she was under 18 years old. Count III alleged that defendant committed the offense of aggravated criminal sexual abuse against his daughter, J.W., by fondling her buttocks when she was under 18 years old. On February 8, 1995, the State added a fourth count to its indictment. Count IV alleged that defendant committed the offense of aggravated criminal sexual assault against M.W. by committing acts of oral sex with her when she was under 18 years old.

On January 20, 1996, defendant filed a motion for severance pursuant to sections 111—4 and 114—8 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111—4, 114—8 (West 1994)). In the motion, defendant asked the trial court to sever the counts pertaining to M.W. from the count pertaining to J.W. The trial court denied the motion.

The trial commenced on April 3, 1995. M.W. testified first for the State. M.W., who was 18 years old at the time of trial, testified that her parents have four children—herself, J.W., Ma.W., and Je.W.—of which she is the oldest. She also has four half-siblings born out of defendant's earlier marriage. M.W. never lived with her half-siblings as she grew up. Her parents divorced, apparently when she was 12, and defendant has since remarried.

M.W. described the house she grew up in as follows. The upstairs had four bedrooms with one full bathroom and one half bathroom. There were two bedrooms toward the front of the house: the master bedroom and the "girls' bedroom." These rooms were connected by the half bathroom. There were two bedrooms toward the back of the house: the "baby's room," which was adjacent to the master bedroom, and Ma.W.'s room, which was adjacent to the full bathroom.

M.W. testified that defendant is a road construction repairman who, when she was growing up, would leave for work at approximately 6 a.m. and return home between 9 p.m. and 1 a.m. When she was three or four years old, defendant started to "touch" her. Defendant would enter her room at approximately 3 a.m. and wake her up. From his smell she could tell that he had been drinking. Oftentimes he would not speak to her; if he did, he would ask her if she wanted a back rub or, as he called it, a "special massage." He would then rub her back and buttocks, remove her pajamas, turn her over onto her back, rub her chest, kiss her on the mouth, and penetrate her vagina with his penis. She stated that this happened more often than she could estimate. He also tried to place his penis in her mouth on about 10 occasions when she was eight or nine years old.

M.W. explained that the frequency of the assaults decreased as

she became older and stopped almost completely by the time she was 10 or 11 years old. Defendant last attempted to assault her in 1988, when she was 12 years old. This assault occurred in his apartment, since her parents by this time were divorced. M.W. explained that as she was cooking dinner defendant turned her around and "French-kissed" her. She then ran off and locked herself in the guest bedroom.

M.W. testified that she lived in two bedrooms during the years these assaults occurred. At first, she lived in the "girls' bedroom." She shared this room with J.W., who was two years younger than she. Sometime from the ages of 7 to 10 she moved into the "baby's room" and lived there by herself. When she moved into the "baby's room," defendant would sometimes sleep in her bed after assaulting her. He slept in her room anywhere from zero to three times per week. He never slept in her bed when she lived in the "girls' bedroom."

According to M.W., she never told anyone about defendant's assaults as she was growing up. She feared defendant's "bad temper," and she thought people would not believe her or they would think it was her fault. He was physically mean to her younger brother Ma.W. during his whole childhood. For instance, he would pull Ma.W.'s ears, push him around, and kick and spank him with a belt. She acknowledged that she always sided with and defended defendant when there were family arguments. She thought that if she could demonstrate that she loved him, he would stop assaulting her.

M.W. further testified that when she was 17 years old she tried to kill herself by attempting to ingest 25 to 30 pain relievers in the bathroom. However, her mother convinced her to open the bathroom door and let her in. Once inside the bathroom, her mother asked her if she had been raped, to which she replied, "sort of." Her mother then tried to guess who had raped her; when she asked if it was defendant, M.W. responded, "yes." Sometime thereafter she started to visit Carlene Fitz-Hugh, a therapist.

On cross-examination, M.W. stated that she has never had an inability to recollect defendant's assaults, even when they were happening. She acknowledged that she was involved in numerous extracurricular activities during high school. She further acknowledged that Detective Mike Leusch of the Waukegan police department interviewed her on June 24, 1994, and she admitted that it was possible she did not tell him that defendant would rub her chest and kiss her before having intercourse with her. She also could not recall whether, in October 1994, she and J.W. accused each other of lying about their allegations against defendant while they were having lunch at a mall with Je.W., Ma.W., and V.W., her half-sister from

defendant's first marriage. On redirect examination, M.W. explained that she never spoke or cried out during the assaults because she was afraid defendant would become violent. Although she did not cry out, she was in pain during the assaults.

J.W., who was 16 years old at the time of trial, testified next. J.W. testified that one evening when she was approximately eight years old she and defendant were on her bed talking when he asked her if she wanted a back rub. When she did not answer, he started to give her one. He began rubbing her back underneath her pajamas, and then he touched her bare buttocks. When he did this, she got up and said she had to tell her mother something. This was the only time he touched her on the buttocks. J.W. also testified that when she shared the "girls' bedroom" with M.W. she could not recall defendant entering the room during the night.

J.W. explained that defendant favored M.W. when she was growing up and that of all the children M.W. was the closest to defendant. According to J.W., defendant would slap Ma.W. in the head, kick him in the buttocks, or pull his ear whenever he did something wrong. This happened "a lot." Like M.W., she could not recall whether they accused each other of lying about their allegations against defendant when they had lunch with Je.W., Ma.W., and V.W. in October 1994.

Jac.W., defendant's ex-wife, and M.W. and J.W.'s mother, testified that she did not know what time defendant would come home after work, because she was asleep by then. She assumed he slept with her every night when he came home, although she did not know for sure, since she never woke up. Defendant was usually drunk when he came home. Defendant would initiate sex with her by giving her what he called a "special massage."

Jac.W. also testified that M.W. attempted to commit suicide when she was 16 years old. M.W. locked herself in the bathroom and said, "I can't live with this anymore, and you can't help me, and I don't want you to know anything." After convincing M.W. to let her in, she started to ask her questions. When she asked M.W. if she had been raped, she "went hysterical" and confessed what defendant had done to her.

Jac.W. admitted that she never saw defendant sleep in M.W.'s bed, nor did she hear any sounds of pain or distress coming from her bedroom. She never observed any blood or semen on M.W.'s bed or linens. She explained that the children changed their own linens when they reached the age of four or five. Also, she did not examine the linens for evidence of blood and semen. She admitted that, when defendant fell behind on his child support payments, she would become upset and express her displeasure of defendant to the children, including M.W.

Carlene Fitz-Hugh, a therapist for marital and family problems, testified that she treated M.W. after her suicide attempt from December 1993 to July 1994. When she first met M.W., she was having headaches, stomachaches, nightmares, and panic attacks. M.W. told her that she first remembered the assaults when she was 14 years old and that she had no memory of them prior to that age. M.W. also told her that she had too many responsibilities in the family and that she was relied upon more as an adult than as a child. M.W. did not want to report defendant to the police because she was afraid of him; eventually, however, she gave Fitz-Hugh permission to report the case to the Department of Children and Family Services (DCFS) in June 1994. Fitz-Hugh also testified that Jac.W. commented to her about how much money defendant and his new wife were earning and that she was having financial problems with defendant.

Dr. Constance Blade, the medical director of the child abuse unit at Grant Hospital, testified next. Dr. Blade testified that she reviewed M.W.'s medical records from childhood. She opined that the records made it impossible to determine whether M.W. was sexually abused as a child. She further opined, however, that obvious trauma to the vaginal area would not necessarily be observed during the examinations M.W. did receive as a child. Among the examinations M.W. did receive (when she was three years old) was a pinworm examination. This examination typically involves touching the perianal area, the area right around the anus, with a piece of scotch tape. For a three-year-old child, the anus is approximately two inches from the vaginal opening. The examination does not require a doctor to administer it. M.W. was also given numerous urinanalysis examinations. Dr. Blade explained that such examinations are unlikely to indicate the presence of sperm unless they are conducted within 72 hours of intercourse. M.W. was also treated numerous times for recurrent vague problems, like headaches and stomachaches. In her opinion, children with recurrent vague problems often suffer from stress and not physical ailments. Finally, M.W. was never given a vaginal examination as a child. According to Dr. Blade, however, there is not always evidence of sexual abuse even when the vaginal area is examined.

On cross-examination, Dr. Blade admitted that headaches and stomachaches are often caused simply because the person has a headache or stomachache. She also admitted that a prepubescent child would experience "lots of pain" if she were completely penetrated by an erect male penis. Also, she would expect obvious trauma to the vaginal area where there has been full penetration and the hymen is torn.

The State rested at the end of Dr. Blade's testimony. After the

trial court denied his motion for a directed verdict, defendant presented his case in chief. V.W., defendant's oldest daughter from his first marriage, testified that on October 31, 1994, she had lunch with M.W., J.W., Ma.W., and Je.W. During the meal, J.W. asked her what she thought about M.W.'s allegations against defendant. J.W. then said, "Well, you know, he did something to me too." M.W. responded, "Shut up, [J.W.]; you are lying," whereupon J.W. said, "No, no, you are." V.W. also testified that M.W.'s and J.W.'s actions were not "unusual" at defendant's 50th birthday party or his wedding to his current wife, events which occurred after defendant and Jac.W. divorced. K.W., defendant's second oldest daughter from his first marriage, confirmed that their actions at these events were not "unusual."

Ma.W. testified that he never saw any contact of a sexual nature between defendant and his sisters. When he was growing up he would "sometimes" wake up in the middle of the night and go to the bathroom. When defendant punished him, he would pull him by the ear or send him to his room. On one occasion, defendant kicked him in the buttocks because he had kicked one of his sisters in the buttocks. On cross-examination, Ma.W. stated that, although he had lunch with V.W., M.W., J.W., and Je.W. in October 1994, he did not recall M.W. accusing J.W. of lying.

Shellye Pechulis, a registered nurse employed as a medical legal consultant by Forensic Medical Consultants, testified, after reviewing M.W.'s medical records, that M.W. had 34 visits with her doctor as a child. Pechulis opined that the medical records do not support any allegations of sexual abuse. For instance, M.W. was given a pinworm examination, but her records do not contain any notations regarding trauma to the vaginal area or other indications of sexual abuse. M.W.'s records also do not contain any notations of her behavior which would be consistent with a child having been sexually abused. Pechulis opined that if a child has sexual intercourse from ages 4 to 12 on a frequent and continuing basis, the child's medical record should contain notations of trauma.

Dr. Nancy Jones, a board-certified forensic pathologist for the office of the medical examiner of Cook County, testified that she reviewed, *inter alia*, M.W.'s medical records, police reports, court documents, and Pechulis' report on the case. After reviewing the medical records, Dr. Jones stated that M.W. never suffered from vaginal bleeding or genital pain as a child, ailments which are common in sexual abuse cases. Although M.W. complained of headaches or abdominal pain, in each such instance these complaints were accompanied by a fever, a strep infection, or some kind of diarrhea and

nausea, which are natural disease processes which would explain those complaints. There was nothing in M.W.'s medical records to substantiate her claim of long-term vaginal intercourse. On cross-examination, Dr. Jones acknowledged that M.W. was given the pinworm examination when she was about three years old, which could have been before M.W. claimed defendant started to assault her.

Richard Frederick, defendant's supervisor at Skokie Valley Asphalt Company (Skokie Valley), testified that defendant has worked for Skokie Valley for 20 years. Defendant's workday would start between 5:30 and 6:15 a.m. and end between 4 and 7 p.m. He met defendant at the start of each day and never noticed him hung over or smelling of alcohol. Norm Pearce and Axel Schwenke, co-workers of defendant, also testified that they had never noticed defendant hung over or smelling of alcohol.

Detective Mike Leusch of the Waukegan police department testified that on June 23, 1994, he interviewed M.W. in response to a DCFS report that she may have been sexually abused. M.W. told him that defendant would enter her room at 3 a.m., have intercourse with her, and fall asleep. This occurred about two or three times a week. Also, when she was seven years old, he forced her to perform oral sex on him. She did not tell him that defendant would kiss her, rub her chest, or fall asleep in her bed only when she lived in the "baby's room."

Detective Leusch also testified that he interviewed J.W. on August 3, 1994. J.W. told him that when defendant rubbed her buttocks, she told him that she had to tell her mother something; she then left the room. Two minutes after making this statement, she stated that she did not know who left the room first.

Defendant testified that he was 5 feet 11 inches tall and weighed about 205 pounds, a height and weight he had maintained for many years. Defendant also testified that he started work between 5 and 5:30 a.m. and ended between 6 and 8 p.m. Occasionally, he would have a beer after work before going home. Defendant categorically denied all the allegations of sexual abuse. Defendant stated that even after he divorced Jac.W., M.W. would visit him at his apartment and once spent the night even though they were alone. He further stated that M.W. spent Christmas 1993 at his house, which was after M.W. told her mother that he had sexually assaulted her as a child. Defendant rested his case at the end of his testimony.

After closing arguments, the jury found defendant guilty of all four counts. The trial court sentenced defendant to concurrent terms of imprisonment of 10 years for each count of aggravated criminal

sexual assault and 5 years for each count of aggravated criminal sexual abuse. Defendant then filed this appeal.

Defendant has three contentions on appeal: (1) the evidence adduced at trial was insufficient to prove him guilty of the charged offenses beyond a reasonable doubt; (2) the trial court erred in denying his motion for severance; and (3) the State improperly elicited from K.W. her opinion that M.W. was a truthful person.

■ Defendant first contends that the evidence adduced at trial was insufficient to prove him guilty of the charged offenses beyond a reasonable doubt. Our standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Charleston*, 278 Ill. App. 3d 392, 398 (1996). This standard of review does not normally allow the reviewing court to substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Childress*, 276 Ill. App. 3d 402, 409 (1995). Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth and resolve minor discrepancies in the testimony of the witnesses. *People v. Lovings*, 275 Ill. App. 3d 19, 22 (1995). Accordingly, a reviewing court will not reverse a criminal conviction unless the evidence presented at trial is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Lovings*, 275 Ill. App. 3d at 22. Nevertheless, despite the deference accorded to a jury's determination of guilt, we are mindful that we have a duty to set aside a conviction when the evidence raises a reasonable doubt of the defendant's guilt. *People v. Schott*, 145 Ill. 2d 188, 206 (1991).

Defendant argues that M.W.'s testimony was inherently improbable, contradictory, and unsupported by corroborating evidence. Defendant highlights what he claims are numerous improbabilities in M.W.'s allegations of abuse, such as why there was no medical evidence to support her claims of frequent and continuing sexual abuse, why she did not cry out in pain when she was assaulted, and why no one over the span of eight years saw the assaults. Defendant argues that these improbabilities mandate that we reverse his conviction.

■ Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of the charges pertaining to M.W. beyond a reasonable doubt. Contrary to defendant's arguments, the absence of medical evidence to support M.W.'s claims does not make her testimony inherently improbable. First, there is no requirement that a victim's testimony

be corroborated by medical evidence to sustain a conviction for criminal sexual assault. *People v. Hermosillo*, 256 Ill. App. 3d 1020, 1030 (1993). Second, Dr. Blade explained that medical corroboration may not exist in this case because the medical examinations M.W. received as a child would not necessarily have revealed obvious trauma to the vaginal area. Although defendant's experts opined that M.W.'s records did not substantiate her claim of long-term vaginal intercourse, the jury was free to accept Dr. Blade's opinions over those of defendant's experts (see *People v. Fierer*, 260 Ill. App. 3d 136, 143 (1994)), which it presumably did (see *People v. Bosnak*, 262 Ill. App. 3d 122, 126-27 (1994) (reviewing court presumes the trial court credited only the testimony that supports its ruling)).

Nor is M.W.'s testimony inherently improbable merely because nobody in the family learned of the assaults as they occurred. Defendant questions why M.W. never cried out in pain during the assaults, or how Jac.W., J.W., and Ma.W. never woke up during the assaults. However, M.W. testified that, although the assaults caused her pain, she did not cry out because she was afraid of defendant. She further testified that she did not tell anyone about the assaults because she did not think anyone would believe her. Although it may have been unusual that nobody learned of the assaults, this fact does not make M.W.'s testimony inherently improbable.

Ultimately, therefore, the issue is one of credibility. On one hand, M.W. testified that defendant vaginally penetrated her over the span of eight years when she was a child, and Jac.W. corroborated M.W.'s testimony that defendant would come home drunk. On the other hand, defendant denied M.W.'s allegations, and he presented evidence which contradicted her testimony on several points. For instance, M.W. testified that she never had an inability to recollect the assaults; Fitz-Hugh, however, testified that M.W. told her that she first remembered the assaults when she was 14 years old. Defendant's co-workers testified that they never noticed defendant hung over or smelling of alcohol. Thus, the jury was presented with two starkly different versions of what had (or had not) happened. By finding defendant guilty, the jury presumably accepted M.W.'s version over defendant's, and we see no reason to substitute our judgment for the jury's. See *Childress*, 276 Ill. App. 3d at 409.

We acknowledge that this is a close case. But in light of the narrow scope of review we are compelled to apply, we are forced to conclude that a rational trier of fact could have found defendant guilty. A jury accepted M.W.'s testimony over defendant's, and her testimony is not so unreasonable, improbable, or unsatisfactory to warrant disturbing the jury's verdict.

■ Defendant also argues that the State failed to prove him guilty of aggravated criminal sexual abuse against J.W. According to defendant, J.W.'s testimony was inconsistent, vague, and improbable and, thus, insufficient to establish him guilty of aggravated criminal sexual abuse.

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of aggravated criminal sexual abuse against J.W. beyond a reasonable doubt. J.W. testified that when she was eight years old she and defendant were on her bed talking when he asked her if she wanted a back rub. When she did not respond, he started to rub her back and then her buttocks. She then jumped up and said that she had to tell her mother something. Although J.W. had difficulty remembering exactly what happened after this, her failure to do so does not render her testimony inherently improbable, especially since the incident occurred eight years before the trial, when she was only eight years old. Nor does her failure to report this incident render her testimony unbelievable. As in M.W.'s case, this case centers on the credibility of the witnesses and the weight to be accorded the evidence. The jury found defendant guilty, and we will not disturb that finding.

Defendant next contends that the trial court erred in denying his motion to sever the counts pertaining to M.W. from the count pertaining to J.W. The trial court denied the motion on the ground that the charges were part of the same comprehensive transaction. In support of its ruling, the trial court noted that the alleged victims were both minor daughters of defendant; the offenses occurred in the same time period and in the privacy of the daughters' bedrooms; and the offenses included similar acts of sexual abuse. Defendant argues that this ruling was improper because (1) the offenses were not part of the same comprehensive transaction; and (2) joinder of the charges prejudiced his case.

■ Preliminarily, we note that the trial court is entitled to substantial discretion when deciding whether to sever charges. *People v. Gibbs*, 226 Ill. App. 3d 1068, 1073 (1992). A reviewing court will not disturb a trial court's decision to grant or deny a motion to sever absent an abuse of discretion. *Gibbs*, 226 Ill. App. 3d at 1073.

■ Section 111—4(a) of the Code (725 ILCS 5/111—4(a) (West 1994)) addresses when it is proper to join charges for a trial. Section 111—4(a) provides:

"Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both,

are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111—4(a) (West 1994).

Conversely, section 114—8 of the Code (725 ILCS 5/114—8 (West 1994)) addresses when charges may be severed. It provides:

"If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." 725 ILCS 5/114—8 (West 1994).

Thus, charges against a defendant may be joined if the offenses are based on two or more acts which are part of the same comprehensive transaction, unless it appears that the defendant will be prejudiced by the joinder of separate charges. *People v. Patterson*, 245 Ill. App. 3d 586, 587 (1993).

■ Accordingly, we must first determine whether the offenses pertaining to M.W. and J.W. are based on two or more acts which are part of the same comprehensive transaction. See *Patterson*, 245 Ill. App. 3d at 587. No precise test exists for determining whether separate offenses are part of the same comprehensive transaction. *People v. White*, 129 Ill. App. 3d 308, 315 (1984). However, Illinois courts typically consider several factors when making such a determination, including: the proximity in time and location of the offenses; the identity of evidence needed to demonstrate a link between the offenses; whether there exists a common method of perpetrating the offenses; whether the defendant is in a similar position of authority in relation to each victim; whether the victims are similar; and whether the severance will promote judicial efficiency. See *Patterson*, 245 Ill. App. 3d at 588; *People v. McLemore*, 203 Ill. App. 3d 1052, 1057-58 (1990); *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990). Because there are so many factors to consider, the decision to sever turns on the facts of each particular case. *White*, 129 Ill. App. 3d at 315.

■ In light of the foregoing factors, we conclude that the charges pertaining to M.W. and J.W. are not based on two or more acts which are part of the same comprehensive transaction. First, the offenses were only peripherally connected in time and place. Admittedly, both daughters were assaulted in the family home, and J.W. was assaulted during the period M.W. was. However, the connection between the charges and their proximity in time is tenuous. According to the daughters' testimony, defendant regularly and frequently assaulted M.W. for eight years, whereas he assaulted J.W. only once during that same time period.

Second, the evidence necessary to establish the elements of each charge was not the same. Defendant was charged with two counts of aggravated criminal sexual assault against M.W. These counts alleged that defendant had vaginal and oral sex with M.W. Defendant was also charged with two counts of aggravated criminal sexual abuse. One count alleged that defendant fondled M.W.'s buttocks, and the other alleged that he fondled J.W.'s buttocks. Thus, the evidence necessary to establish the elements of each charge was the same only with respect to the charges of aggravated criminal sexual abuse; there was no similarity between the evidence necessary to establish the elements of the charges of aggravated sexual assault pertaining to M.W. and the elements of the charge of aggravated sexual abuse pertaining to J.W.

Third, the evidence does not establish a common method in perpetrating the offenses. In M.W.'s case, defendant had intercourse with M.W. over the span of eight years. While intoxicated, defendant would enter her bedroom at 3 a.m., wake her up, rub her back and buttocks, remove her pajamas, rub her chest, kiss her, and then penetrate her vaginally. When she was eight or nine years old, he also tried to have oral sex with her on about 10 occasions. In J.W.'s case, defendant once gave her a back rub and touched her bare buttocks when she was eight years old. This occurred one day at approximately 8 p.m. before she had gone to bed. Notwithstanding that defendant assaulted each girl in her bedroom and that he prefaced the assaults by giving them back rubs, marked differences exist in how defendant perpetrated the offenses.

Fourth, the victims are similar. Both M.W. and J.W. are defendant's natural children. M.W. was assaulted from the ages of 3 to 12, and J.W. was assaulted at the age of 8.

Finally, trying the charges together promoted judicial efficiency. Nevertheless, we place little weight on this factor. The question of promoting judicial efficiency cannot be the only or main factor in a trial court's decision not to sever charges, because the question is present each time a severance is requested. *Patterson*, 245 Ill. App. 3d at 589. Admittedly, this factor may acquire greater significance where the victims of the crimes are young children, since severance may force the child witness to testify twice about traumatic experiences. See *Patterson*, 245 Ill. App. 3d at 589. However, this concern is not implicated here, since, as explained below, M.W.'s and J.W.'s testimony would not be admissible in separate trials, and thus they would not have to testify twice.

Based on our assessment of the relevant factors and in light of the evidence presented at trial, we find that the trial court erred in

ruling that the offenses charged in this case were part of the same comprehensive transaction. At most, the offenses were similar in that they were committed against defendant's daughters in their bedrooms and were prefaced by back rubs. Still, such superficial similarities, by themselves, do not authorize joinder. Ultimately, we are left with the firm conviction that the offenses pertaining to each daughter are distinct, with different victims and dates, and not part of the same comprehensive transaction. As such, the trial court abused its discretion in denying defendant's motion to sever. See *People v. York*, 29 Ill. App. 3d 113, 117-19 (1975).

We note the State's reliance on *People v. Patterson*, 245 Ill. App. 3d 586 (1993), and *People v. Trail*, 197 Ill. App. 3d 742 (1990), in support of its argument that the charges are part of the same comprehensive transaction. In *Patterson*, the defendant inflicted similar acts of sexual assault against his son and daughter in the family home on a regular basis, although not at the same time, over a period of three years. 245 Ill. App. 3d at 587-89. In *Trail*, the defendant engaged in anal, oral, and vaginal intercourse with one stepdaughter for seven years, and vaginal intercourse with a second stepdaughter for two years. 197 Ill. App. 3d at 744-45. Thus, in both cases, the children were subject to similar acts of sexual assault from their fathers. Here, in contrast, M.W. and J.W. were subject to dissimilar acts of sexual conduct by defendant. Defendant vaginally penetrated M.W. on a regular basis for eight years, whereas he fondled J.W.'s buttocks once. Given the differences in the nature of the conduct against M.W. and J.W., as opposed to the similarities in the nature of the assaults committed against the defendants' children in *Patterson* and *Trail*, we find those cases not controlling.

Our analysis does not end here, however, for even when a defendant is forced to trial on disassociated charges, a reviewing court will not reverse the judgment of the trial court if it is apparent that no prejudice resulted from the misjoinder. *People v. Sockwell*, 55 Ill. App. 3d 174, 177 (1977); see *Patterson*, 245 Ill. App. 3d at 591. A significant consideration in determining whether prejudice results is whether the admission of evidence concerning a sexual assault on one child would be allowed in the trial of a charge of sexual assault against another child. See *Patterson*, 245 Ill. App. 3d at 590-91; *Trail*, 197 Ill. App. 3d at 746. As the *Trail* court explained, "[T]he potential prejudice to a defendant of having the jury *decide* two separate charges is greatly diminished [where] the jury is going to be receiving evidence about both charges anyway." (Emphasis in original.) 197 Ill. App. 3d at 746.

Here, defendant maintains that, if the charges pertaining to J.W.

and M.W. had been tried separately, evidence of defendant's alleged crimes against one daughter would have been inadmissible in the trial on the charges concerning the other daughter. Defendant accordingly reasons that joinder of the charges prejudiced his case and that we should reverse his conviction and remand this matter for separate trials. In reply, the State argues that if the charges pertaining to each daughter had been tried separately, the evidence concerning M.W. would have been admissible in the trial for the charges relating to J.W., and vice versa.

Generally, evidence of other crimes is inadmissible where that evidence is relevant solely to establish a defendant's propensity to commit crime. *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). However, evidence of other crimes is admissible where relevant for any purpose other than to show the propensity to commit crime. *Robinson*, 167 Ill. 2d at 62. For instance, evidence of other crimes may be relevant to prove intent, identity, motive, absence of mistake, the existence of a common plan or design, or *modus operandi*. *Robinson*, 167 Ill. 2d at 62-63; *People v. Banks*, 161 Ill. 2d 119, 137 (1994).

In the present case, the State argues that defendant's behavior toward J.W. and M.W. would be admissible in separate trials pursuant to the *modus operandi* exception. The *modus operandi* or "method of working" exception refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person. *People v. Berry*, 244 Ill. App. 3d 14, 21 (1991). There must be a strong and persuasive showing of similarity between the offense offered to prove *modus operandi* and the offense charged. *People v. Tate*, 87 Ill. 2d 134, 141 (1981). This showing must create the logical inference that, if the defendant committed the former offense, he also committed the latter. *Berry*, 244 Ill. App. 3d at 21. This inference arises when both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork. *Berry*, 244 Ill. App. 3d at 21. The offenses need not be identical but must share features which, although common to similar crimes in general, are distinctive when considered together. *Berry*, 244 Ill. App. 3d at 21.

In arguing that the offenses involved herein share a *modus operandi*, the State lists several similarities between the offenses pertaining to M.W. and the offense pertaining to J.W.: both victims were defendant's daughters; both were assaulted in their bedrooms; both were relatively the same ages when they were assaulted; and defendant initiated the assaults by giving back rubs. Based on these similarities, the State maintains that joinder was proper.

In our view, these purported similarities do not establish a

distinctive pattern of criminal behavior which would earmark the alleged offenses as the work of defendant. The similarities noted by the State are not so strong and persuasive as to create the inference that, if defendant committed the offenses against M.W., he also committed the offense against J.W., and vice versa. Many of the similarities noted by the State are common to many offenses of this type (*e.g.*, both victims lived with defendant), and others are merely descriptive of the crime of aggravated criminal sexual abuse (*e.g.*, both victims were related to defendant, both were under 18 years of age, and their buttocks were both touched). See Ill. Rev. Stat. 1987, ch. 38, par. 12—16(b) (now 720 ILCS 5/12—16(b) (West 1994)) (person commits aggravated criminal sexual abuse if he commits an act of sexual conduct against a family member who is under 18 years of age). Moreover, those similarities that are arguably distinctive—that defendant assaulted both daughters in their bedrooms and initiated the assaults by giving them back rubs—are not the type of similarities that earmark these offenses as defendant's handiwork. As such, the similarities in the charges do not satisfy the *modus operandi* exception, and evidence of defendant's other crimes against one daughter would not be admissible at the trial pertaining to the other daughter's charges. Accordingly, defendant was prejudiced by having the charges tried jointly.

We again note the State's reliance on *Trail* and *Patterson*, this time in support of its argument that evidence of defendant's other crimes would be admissible as evidence of *modus operandi*. However, such reliance is misplaced. As noted, *Trail* and *Patterson* are distinguishable. In those cases, the defendants committed similar acts of sexual abuse against their children. In the present case, defendant allegedly committed different acts of sexual abuse against M.W. and J.W.

The State also maintains that, even if it was error to have the cases tried jointly, the error is harmless because J.W.'s testimony did not contribute to the jury's decision to convict defendant on the charges pertaining to M.W. We disagree. Where, as here, the outcome of a trial depends entirely on the credibility of the complainant and the defendant, no error should be permitted to intervene. See *People v. Woltz*, 228 Ill. App. 3d 670, 676 (1992).

Defendant's third contention is that the State improperly elicited from K.W. her opinion that M.W. was a truthful person. Because we are reversing defendant's convictions, we need not address this contention.

In conclusion, we reverse defendant's convictions and remand this matter for separate trials on the charges pertaining to M.W. and

J.W. Parenthetically, we note that, although we have determined that a rational jury could find that the State proved the essential elements of the charged crimes beyond a reasonable doubt, this determination is not a "finding as to defendant's guilt or innocence that will be binding in a new trial." *People v. Champs*, 273 Ill. App. 3d 502, 511 (1995).

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

INGLIS and THOMAS, JJ., concur.