No. 2--97--0227

November 13, 1998

IN THE 

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court 

OF ILLINOIS, ) of Lake County.

)

Plaintiff-Appellee, ) 

) 

v. ) No. 96--CF--2925 

) 

GEORGINA M. ZIZZO, ) Honorable 

) Victoria A. Rossetti,

Defendant-Appellant. ) Judge, Presiding.

 

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Georgina M. Zizzo, was charged by indictment with felony theft (720 ILCS 5/16--1(a)(2)(A) (West 1996)).  After a jury trial, she was convicted, sentenced to 36 months of probation and 12 months of work release, and ordered to pay $55,000 in restitution.  Defendant now appeals, arguing that the State did not prove her guilty beyond a reasonable doubt.  We affirm.

I.  FACTS

The State's first witness, Carol Carl, testified that, in May 1996, while updating her family's financial records, she discovered a series of unauthorized automatic teller machine (ATM) withdrawals from her account at First Bank of Highland Park (the Bank).  Carl immediately called the Bank to report the unauthorized withdrawals, and the Bank's vice-president invited her in to review the matter.  After reviewing her records at the Bank, Carl contacted the police and filed a report.  The Carls' account records established that the unauthorized ATM withdrawals were made between October 1995 and May 1996 and totaled $62,072.86.

The State next called Billie Carr.  Carr testified that he was a good friend of defendant, whom he had met in the summer of 1995.  In September 1995, shortly after defendant began working at the Bank, Carr and defendant opened a joint checking account at the Bank.  In October 1995, defendant told Carr to go to the Bank because someone named Barb Kubas wanted him to do Kubas a favor.  Carr called Kubas, and Kubas asked Carr to come to the Bank.  Carr went to the Bank alone and found Kubas at her desk.  Kubas walked Carr over to the ATM, opened a file folder, and handed Carr an ATM card bearing the name "Daryl Simson."  Asked whether he knew where the name "Daryl Simson" had come from, Carr responded that the name was on the ATM card when he arrived.  After using the ATM card to make three withdrawals totaling $500, he left the ATM card and some of the cash by Kubas's car.  

Carr went on to testify that, in the spring of 1996, he called Barb Kubas, whom he had now given the nickname, "Tampa," to find out whether he could obtain a second ATM card.  Kubas told Carr to "come back in and get another card.  When he went to pick up the second ATM card, Carr was accompanied by someone who was driving defendant's car.   Carr did not speak with defendant about what had happened to the first ATM card, and defendant did not accompany Carr when he picked up the second ATM card.  On June 4, 1996, Carr returned to the Bank to pick up a third ATM card because the ATM would no longer accept the second card.  On this occasion, defendant was with him.  Shortly after requesting the card, defendant was arrested.  Carr admitted to using the ATM cards to acquire about $600 but denied knowing what happened to the rest of the money.  In a statement given to the police immediately after his arrest, Carr repeatedly referred to his girlfriend, "Tampa," because he did not want to name Barb Kubas.

Carr's trial testimony directly contradicted at least two prior statements he had made.  On November 18, 1996, just prior to receiving his sentence for his part in the ATM scheme, Carr testified that (1) defendant had set up the false ATM card using one of the Bank's laptop computers; (2) defendant had told him to go to the Bank to pick up the false ATM card; (3) defendant told him to use the name “Daryl Simson”; (4) after withdrawing $400, he gave the first ATM card to defendant; (5) he played no part in setting up the false ATM card; and (6) Barb Kubas knew nothing about defendant's scheme.  Carr emphasized that his story was truthful, that he was willing to retell it under oath at defendant's trial, and that he would accept the service of a subpoena to testify at defendant's trial.  At defendant's trial, Carr's November 18, 1996, testimony was admitted as substantive evidence as a prior inconsistent statement under section 115--10.1 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115--10.1 (West 1996)).

Carr's testimony at defendant's trial also contradicted an unsworn statement Carr gave to the assistant State's Attorney on January 2, 1996, four days before defendant's trial began.  During his direct examination at defendant's trial, Carr admitted to telling the assistant State's Attorney that (1) defendant was responsible for setting up the false ATM card; (2) defendant kept the false ATM card after Carr made his initial withdrawals; (3) “Tampa” was in fact defendant; and (4) Barb Kubas knew nothing about defendant's ATM card scheme.  However, Carr denied stating that defendant kept most of the withdrawn money.  Carr attributed the inconsistencies between his trial testimony and his January 2, 1996, statement to his not being represented by counsel during the January 2, 1996, interview.  The trial court admitted Carr's January 2, 1996, statement for impeachment purposes only.

The State next called Barb Kubas, a retail banker, who worked with defendant at the Bank.  Kubas explained that defendant worked as a temporary entry-level receptionist whose duties included greeting customers and filing.  Defendant's duties did not include opening accounts.

According to the Bank's records, Kubas issued ATM cards to Daryl Simson in October 1995 and March 1996.  Although Kubas did not recall issuing the October 1995 ATM card, she did remember issuing the March 1996 card.  According to Kubas, Daryl Simson approached her desk in March 1996 and requested a new ATM card.  Without asking for any identification, Kubas pulled Daryl Simson's ATM file, generated a new ATM card, and handed the card to Carr.  Kubas testified that, under the Bank's standard operating procedures at the time, she was not required to ask for identification before issuing an ATM card.  When asked whether she knew who set up the Daryl Simson ATM account and file, Kubas responded “No.” 

Sometime after March 1996, Kubas learned that Daryl Simson was in fact Billie Carr, a friend of defendant's.  After the Carls discovered the unauthorized withdrawals from their account, Kubas assisted in the Bank's internal investigation.  That investigation focused exclusively upon defendant and Billie Carr; nobody else was investigated.  When Carr returned to the Bank on June 4, 1996, to obtain a third ATM card, Kubas notified the Bank's security officer.  The security officer called the police, and Carr was arrested.  Kubas denied any knowledge of, or participation in, the ATM scheme.

The State next called Lillian Herter, a vice-president at the Bank.  Herter reviewed the Carls' account records and stated that the unauthorized ATM withdrawals totaled $62,072.86.  The same records showed that the unauthorized withdrawals had been made using the Daryl Simson ATM card, which had been programmed to withdraw money from the Carls' account.  The records did not show, however, who had created the Daryl Simson ATM account and file.  Herter testified that she had no way of knowing from the records who set up the Daryl Simson ATM account and that anyone with access to the Bank's computer accounts system could have done it.  Herter then confirmed that defendant worked at the Bank from September 12, 1995, through October 13, 1995, as a temporary receptionist in the retail banking department.  As a temporary receptionist, defendant was responsible for filing and, like all employees in the retail banking department, had access to the unlocked ATM records.  However, she was not authorized to access the Bank's computer accounts system.

The State next called Dr. Jane Homeyer, executive director of the Northern Illinois Police Crime Laboratory.  Homeyer testified that she performed a fingerprint analysis on the Daryl Simson ATM account file.  Homeyer found two prints suitable for comparison, both of which matched defendant's.  Homeyer noted, however, that her analysis could not establish either when or in what context the fingerprints had been left.

Finally, the State called Mike Nerheim, an intern in the Lake County state's attorney's office.  Nerheim testified that he had been present for Carr's January 2, 1996, interview with the assistant State's Attorney.  According to Nerheim, Carr stated in the interview that (1) defendant had set up the fraudulent ATM card scheme; (2) defendant told Carr to go to the Bank and pick up an ATM card for "Daryl Simson"; (3) after Carr had made his initial $400 withdrawal, defendant took and kept the Daryl Simson ATM card; and (4) "Tampa" was in fact defendant.  Nerheim added, however, that he did not take any notes during the January 2, 1996, interview and that Carr's interview was neither recorded nor transcribed.

Defendant moved for a directed verdict, arguing that the State's case did not comport with the indictment because the indictment did not allege an accountability theory.  The trial court denied the motion.  Defendant then rested, and the jury returned a guilty verdict.  Defendant refiled her directed verdict motion as a motion for judgment notwithstanding the verdict, and the trial court denied that motion as well.  The trial court sentenced defendant to 36 months of probation and 12 months of work release and ordered her to pay $55,000 in restitution.  This timely appeal followed.

II.  ANALYSIS

Before reaching the merits of this appeal, we must summarily dispose of the State's argument that the issue presented is waived.  Citing 
People v. Enoch
, 122 Ill. 2d 176 (1988), the State argues that defendant waived her challenge to the sufficiency of the evidence by not raising it in the trial court.  The State's argument is entirely without merit, as it is well established that a defendant may challenge the sufficiency of the evidence for the first time on appeal.  See 
People v. Enoch
, 122 Ill. 2d at 190. 

We now turn to the merits.  Our
 standard of review on a challenge to the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the State, 
any
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).  Our task is not to retry the accused, and we will not substitute our judgment for that of the trier of fact with respect to the witnesses' credibility, the weight to be given to the evidence, or the reasonable inferences to be drawn from the evidence.  
People v. McDonald
, 168 Ill. 2d 420, 448-49 (1995).  We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the accused's guilt.  
Collins
, 106 Ill. 2d at 261.
  Here, defendant was charged with committing a theft in violation of section 16--1(a)(2)(A) of the Criminal Code of 1961 (720 ILCS 5/16--1(a)(2)(A) (West 1996)).  The State therefore was required to prove that, through deception and with an intent to deprive the owner permanently of its use or benefit, defendant obtained control over the owner's property.  720 ILCS 5/16--

1(a)(2)(A) (West 1996).

Defendant argues that the State failed to prove her guilty beyond a reasonable doubt because the State's case rested primarily upon Carr's recanted prior inconsistent statement and that, as a matter of law, a recanted prior inconsistent statement cannot support a conviction.  In support of her position, defendant relies upon 
People v. Reyes
, 265 Ill. App 3d 985 (1993); 
People v. Parker
, 234 Ill. App. 3d 273 (1992); 
People v. Wise
, 205 Ill. App. 3d 1097 (1990); and 
People v. McCarthy
, 102 Ill. App. 3d 519 (1981).

In 
Reyes
, Reyes was charged with attempted first degree murder for his alleged participation in a group beating.  The State's first two witnesses testified that, although they were present at the scene when the beating occurred, they could not recall whether Reyes had participated in the beating.  Both witnesses acknowledged that their trial testimony directly contradicted their grand jury testimony in which they identified Reyes as one of the people who beat the victim.  The first witness explained that her grand jury testimony had been a lie, while the second witness assumed that she must have misunderstood the grand jury's questions.  Reyes testified that, although he was present when the beating began, he quickly left the scene and did not participate in the beating.

The appellate court held that the State had not proven Reyes guilty beyond a reasonable doubt.  The court explained that the only evidence to contradict Reyes' assertion that he had not participated in the beating was the first two witnesses' grand jury statements.  
Reyes
, 265 Ill. App. 3d at 989.  The credibility of those statements, however, was highly suspect in that (1) both witnesses recanted during Reyes' trial; (2) both statements consisted merely of "yes" and "no" answers to leading questions from the State; and (3) one of the witnesses testified, without contradiction, that the police had coerced her into identifying the defendant.  Because the disavowed and highly suspect grand jury statements were the sole evidence of Reyes' guilt, the court held that the State failed to prove Reyes guilty beyond a reasonable doubt.  
Reyes
, 265 Ill. App. 3d at 990.

Similarly, in 
Parker
, the State's three eyewitnesses testified at Parker's trial that Parker had not participated in the crime.  Pursuant to section 115--10.1 of the Code, the State then introduced the three witnesses' prior inconsistent statements in which they stated that Parker had participated in the crime.  The jury convicted Parker, and he appealed.  
Parker
, 234 Ill. App. 3d at 274-79.  On appeal, the court reversed Parker's conviction on the ground that the State had failed to prove Parker guilty beyond a reasonable doubt.  The court explained that the credibility of the prior inconsistent statements was severely undermined by the three witnesses' trial testimony, which exculpated defendant and cast doubt on those statements' authenticity.  
Parker
, 234 Ill. App. 3d at 280-81.  Specifically, the first witness, who gave his prior statement in the hospital while recovering from surgery, testified that he gave the statement because he was in a great deal of pain and wanted the detective to leave his hospital room.  The second and third witnesses signed their statements because a detective had threatened to arrest them if they did not.  Given the unreliability of the three prior statements, combined with the complete lack of physical evidence, the court concluded that the State had not proved Parker guilty beyond a reasonable doubt.  
Parker
, 234 Ill. App. 3d at 280-81.

In 
Wise
, the complaining witness at Wise's trial identified Wise as one of the two men who had robbed him.  The defense, however, introduced two signed statements from the complaining witness stating that Wise had nothing to do with the robbery.  The complaining witness admitted to signing the statements, but he disavowed them on the ground that he did not know that the investigator who gave them to him was working for Wise.  The jury convicted Wise, and he appealed.  On appeal, the court reversed for insufficient evidence.  The court explained that the complaining witness's credibility was severely undermined by the discrepancies between his trial testimony and the two signed statements.  This lack of credibility, combined with a compete lack of any corroborative evidence, rendered the complaining witness's trial testimony insufficient to sustain Wise's conviction.  
Wise
, 205 Ill. App. 3d at 1101.

Finally, in 
McCarthy
, McCarthy, an off-duty police officer, was convicted of aggravated battery for shooting Dolores Custodio.  McCarthy admitted to shooting Custodio but insisted that the shooting was in self-defense.  At McCarthy's trial, the State called seven occurrence witnesses, all of whom were passengers in a car with Custodio when she was shot and five of whom were related to Custodio.  The State also called Custodio, who since had filed a personal injury lawsuit against McCarthy.  In reversing McCarthy's conviction, the appellate court emphasized that each witness, including Custodio, told a different story and that many of those stories differed significantly from earlier statements given to the police.  Despite their differences, however, many of the stories also contained several identical details that strongly suggested that the seven witnesses had discussed and attempted to reconcile their accounts.  In fact, several of the witnesses admitted to discussing their testimony together prior to appearing in court.  Given the abundance of biases, inconsistencies, and suspicious consistencies, the court concluded that the evidence was insufficient to support defendant's conviction.  
McCarthy
, 102 Ill. App. 3d at 524.

Unlike defendant, we do not believe that 
Reyes
, 
Parker
, 
Wise
, and 
McCarthy
 stand for the proposition that, as a matter of law, a recanted prior inconsistent statement cannot support a criminal conviction.  On the contrary, these cases clearly turn on their facts.  As we read 
Reyes
, 
Parker
, 
Wise
, and 
McCarthy
, the court in each of those cases found, 
under the particular facts and circumstances at issue
, that the recanted inculpatory statements could not support the defendant's conviction.  Significantly, in three of those cases, there were reasons in addition to the mere discrepancies in the testimony to question the credibility of the inculpatory statements.  In both 
Parker
 and 
Reyes
, the witnesses testified that their inculpatory statements were either coerced or given under duress.  In 
McCarthy
, five of the seven witnesses were related to and lived with the victim, the victim had filed a personal injury lawsuit against McCarthy, and there was a strong reason to suspect that several of the State's witnesses had coordinated at least some aspects of their testimony in advance.  Finally, in all four cases, the State did not have a single piece of evidence to corroborate the witnesses' inculpatory statements.  Given the multitude of factual considerations at work in each of these cases, we simply cannot say that 
Reyes
, 
Parker
, 
Wise
, and 
McCarthy
 establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction.

Instead, we believe the better rule is that articulated in 
People v. Curtis
, 296 Ill. App. 3d 991 (4th Dist. 1998), and we hereby adopt that rule.  In 
Curtis
, the defendant argued that, under 
Reyes
 and 
Parker
, the court must reverse his conviction as a matter of law because it was based upon a recanted prior inconsistent statement.  In rejecting this argument, the court first emphasized that it did not agree with the defendant's interpretation of 
Reyes
 and 
Parker
.  The court added, however, that, even if the defendant's reading of those cases was correct, it would not follow those cases.  
Curtis
, 296 Ill. App. 3d at 997.  Relying upon the Illinois Supreme Court's decision in 
People v. Schott
, 145 Ill. 2d 188 (1991), the court held that, where evidence is claimed to be insufficient on review, the 
Collins
 test is to be applied 
regardless of the nature of the evidence
.  
Curtis
, 296 Ill. App. 3d at 998-99.  Thus, where a jury or trial court has convicted a defendant on the basis of a recanted prior inconsistent statement, the question for the reviewing
 court is not whether any evidence existed to corroborate that statement.  
Curtis
, 296 Ill. App. 3d at 999.  Rather, the only inquiry is whether, after viewing the evidence in the light most favorable to the State, 
any
 rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  
Curtis
, 296 Ill. App. 3d at 999; see also 
People v. Arcos
, 282 Ill. App. 3d 870, 875 (1996); 
People v. Bailey
, 265 Ill. App. 3d 262, 275-77 (1994). 

Turning to the present case, we believe that, under 
Curtis
 and 
Collins
, defendant's conviction must be affirmed.  Looking first at Carr's  prior inconsistent statement, the jury was presented with two sworn accounts of defendant's role in the ATM scheme, both of which could not be true.  As the trier of fact, the jury was charged with weighing both of those statements and determining which, if either, was to be believed.  See 
Arcos
, 282 Ill. App. 3d at 875.  Looking at Carr's two statements in the light most favorable to the State, the jury reasonably could have concluded, after listening to and watching Carr on the witness stand, that the testimony Carr gave at his sentencing hearing was truthful and that his testimony for defendant was untruthful.  Indeed, judging from its verdict, we can presume the jury did precisely this.  We find nothing in the record to justify the substitution of our judgment for that of the jury with respect to Carr's credibility.
  See 
McDonald
, 168 Ill. 2d at 448-49.

Our willingness to conclude that a rational fact finder could have believed Carr's prior inconsistent statement is enhanced by the State's introduction of physical evidence to corroborate that statement.  Carr's prior inconsistent statement was corroborated by the fact that defendant's fingerprints were found on the Daryl Simson ATM application.  Although the jury reasonably could have inferred that defendant left those prints in the course of performing her official duties at the Bank, it just as reasonably could have inferred that defendant left those prints in the course of perpetrating her crime.  Viewing the evidence in the light most favorable to the State, we must conclude that the jury drew the latter reasonable inference.  

Defendant contends, however, that, because an innocent explanation is available for the discovery of her fingerprints on the Daryl Simson ATM file, those fingerprints cannot be used to support her conviction.  Defendant relies upon 
People v. Gomez
, 215 Ill. App. 3d 208 (1991), in which this court held that, to support a conviction, fingerprint evidence must satisfy both physical and temporal proximity criteria: the fingerprints must have been found in the immediate vicinity of the crime and under such circumstances that they could have been made only at the time the crime occurred.  
Gomez
, 215 Ill. App. 3d at 216.  Although we do not dispute defendant's reading of our decision in 
Gomez
, we must emphasize  that the physical and temporal proximity criteria come into play only when a conviction is based solely upon circumstantial fingerprint evidence.  
Gomez
, 215 Ill. App. 3d at 216.  Here, the discovery of defendant's fingerprints on the Daryl Simson ATM file was not the sole basis for defendant's conviction, as it was introduced to corroborate Carr's prior inconsistent statement.  Accordingly, the jury properly could have considered the discovery of defendant's fingerprints on the Daryl Simson ATM file as evidence of defendant's guilt.

III.  CONCLUSION

In sum, we conclude that, when taken together and viewed in the light most favorable to the State, Carr's prior inconsistent statement and the discovery of defendant's fingerprints on the Daryl Simson ATM file could permit a rational trier of fact to conclude beyond a reasonable doubt that defendant committed a felony theft by unlawfully withdrawing money from the Carls' bank account.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON and RAPP, JJ. concur.