THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEONARD LOGAN, Defendant-Appellant.

First District (5th Division)   No. 1—02—0966

Opinion filed August 20, 2004.—Rehearing denied September 29, 2004.

74

Edwin A. Burnette, Public Defender, of Chicago (Timothy J. Leeming, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Heather Weiss and Marina C. Para, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Leonard Logan, appeals his conviction and 45-year sentence for first degree murder. Defendant contends: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State made improper remarks during closing argument; (3) the State failed to prove that he was fit for trial; and (4) his trial counsel provided ineffective assistance. We affirm.

On March 18, 1997, between approximately 11 and 11:30 p.m., L.C. Robinson was driving north on Yates Boulevard in Chicago. As he crossed through the intersection at Yates Boulevard and 75th Street, he saw his friend, Charles Jenkins, talking on a pay phone at an Amoco station located on the corner of that intersection. He also saw the victim, Timothy Jones, talking on a second pay phone. Robinson watched as a "short, about 5'9", 5'10", kind of heavy-set" African-American man got out of a sport utility vehicle (SUV) that was parked

approximately 20 feet from the pay phones. The man approached the pay phones, and when he was two or three feet away, he pulled a gun from his waistband and aimed it at the victim's head. Robinson watched as the man shot the victim. He saw the victim fall to the ground and then saw the shooter fire two or three more shots at other people in the vicinity.

Robinson watched as the shooter returned to the SUV and got in the front passenger side, and the car drove away down 75th Street. Robinson made a U-turn and followed the SUV westbound on 75th Street. He wrote down the vehicle's license plate number and called 911 and gave the 911 operator this information. Robinson followed the SUV until it turned into an alley and then he returned to the Amoco station. At the Amoco station, Robinson told the police what he had seen.

The Chicago police traced the license plate to a Budget Rent-A-Car rental agency and determined that the vehicle had been rented to an L. Payton. Detectives Alejandro Almazon, William Higgins and Edward O'Boyle went to the apartment of Latonya Payton at approximately 6:30 p.m. on March 19, 1997. The detectives first asked Ms. Payton about the two men they had seen in the hallway as they approached her apartment, and Ms. Payton denied knowing the men. The detectives then asked Ms. Payton about the vehicle. Ms. Payton told them that she had rented it and that it had been parked in front of her building from the evening of March 18, 1997, to the present time, March 19, 1997. When the detectives told Ms. Payton that the vehicle was involved in a shooting, she again told them that it had been parked in front of her building and she had no knowledge of what they were talking about.

The detectives asked Ms. Payton about the beer bottles and the two large pizzas in her apartment and she admitted that the two men walking down the hallway were friends of hers and had been in her apartment. Ms. Payton told the detectives that another friend of hers borrowed the vehicle she rented on the 18th, but this person was not either of the two who had just left her apartment. Ms. Payton did not give the detectives the names of the two men who had just left her apartment. The detectives told her that the shooting was a homicide, and Ms. Payton agreed to go to the police station to speak with the detectives about the shooting. The detectives also brought the vehicle to the station for evidence processing. They left Ms. Payton's apartment at approximately 6:45 p.m. on March 19, 1997.

At the station, the detectives asked Ms. Payton about March 18, 1997, and she said that at approximately 11 p.m., her friend Rodman came over to her apartment with a man named either Keith or Kevin.

Ms. Payton said that the men came over to assemble an entertainment center, but they were unable to put it together that night because they arrived too late. Ms. Payton said that Rodman then asked to borrow the car and she gave him the keys. Rodman returned the car approximately 20 minutes later.

At approximately 10 p.m., the detectives took Ms. Payton for a polygraph examination. She returned to the police station at 12:30 a.m.

At approximately 1 a.m. on March 20, 1997, the detectives spoke with Ms. Payton again. This time, Ms. Payton explained that Rodman borrowed the car and that the two men who were leaving her apartment when the detectives arrived were Dino and a friend of his whom she did not know.

At approximately 8 a.m., Ms. Payton told the detectives that Rodman had come to her apartment that night with Dino at approximately 11 p.m. The two men borrowed the car and returned to her apartment at approximately 2 a.m. Dino came back the next morning at approximately 7 a.m. and borrowed the car again. Ms. Payton said that she thought Dino's first name was either Leonard or Anthony, and that his last name was Logan. Ms. Payton then identified a picture of the defendant as Dino, who had come to her apartment.

At approximately 2 p.m. on March 20, Ms. Payton told the detectives that Rodman was at her apartment that night and that he did not borrow the car. She said that Dino was the only person who took her car that night.

At approximately 4 p.m. on March 20, Ms. Payton took a second polygraph examination. She returned to the police station at approximately 6:30 p.m. and detectives had another conversation with her at 7 p.m.

Ms. Payton told the detectives that on March 18, 1997, she was in the car she had rented and the defendant was driving with Rodman in the backseat. They were driving down 75th Street approaching Yates Boulevard when the defendant pulled into the gas station and got out of the car. He pulled a gun out of his waistband and started shooting at a man who was on the telephone. Defendant then turned, shot down the alley at another person, got back into the vehicle and sped away. Defendant noticed another car following them so he pulled into an alley to elude the vehicle. Then they drove to Stateway Gardens, which is in the area of 36th and Federal Streets. There, defendant went into one of the apartment buildings and returned after approximately 10 minutes. Defendant had changed his clothes and he no longer had the gun with him.

On March 21 at approximately 7 a.m., Assistant State's Attorney (ASA) Kent Sinson had a conversation with Ms. Payton. At ap-

proximately 7:50 a.m., Ms. Payton agreed to give a statement and ASA Sinson wrote out the statement.

At approximately 9:30 a.m. on March 21 Ms. Payton testified before the grand jury. Ms. Payton testified that on March 15, 1997, she rented a Nissan Pathfinder from the Budget Rent-A-Car so that she could bring home an entertainment center she had purchased. On March 16, 1997, she met up with a man named PeeWee at the Stateway Gardens Chicago Housing Authority (CHA) complex. There, she also saw the defendant, whose nickname was Dino. On March 17, 1997, she made arrangements with the defendant over the phone for him to borrow the car she had rented. The defendant picked up the car and returned it approximately 90 minutes later. On March 18, 1997, the defendant called Ms. Payton at work because he wanted to borrow the car again. Ms. Payton agreed and the defendant picked her up from work at 5:15 or 5:30 p.m. They ran some errands and then went to Stateway Gardens, where they met up with Rodman. A few hours later, the defendant drove the three of them down 75th Street. As they approached the intersection of 75th Street and Yates Boulevard, the defendant noticed the victim. The defendant then pulled the car into the gas station and got out of the car. Ms. Payton heard a gunshot approximately three minutes later, and she looked and saw a young man near the pay phones fall to the ground. Ms. Payton saw the defendant firing the gun. Defendant then got back in the car, put the gun on the seat between his legs and drove away. As they drove away, the defendant noticed a car following them so he pulled into an alley. After five minutes, the defendant drove to Stateway Gardens, where he went into a building. He returned approximately 10 minutes later without the gun.

Ms. Payton testified to the grand jury that on March 19, 1997, she saw the defendant when he again borrowed the car. She stated that he was supposed to pick her up at work, but instead he called and asked whether Budget had called her about the car. Ms. Payton told him that the car was not due back until March 20. Later that night, the defendant and another man came to Ms. Payton's apartment to set up her entertainment center. As they ate pizza, the police arrived and the defendant left Ms. Payton's apartment through the back way.

At trial, Ms. Payton testified that her grand jury testimony and her written statement were coerced and that the police told her what to say. Ms. Payton testified that the defendant's nickname was Dash, and she denied ever telling the police or the grand jury that his nickname was Dino. She repeatedly testified that the police told her what to say. Ms. Payton also testified that the police told her that if she did not come up with something, she would be charged with

murder. She testified that the police threatened her and that she was not allowed to eat or sleep for three days.

The detectives testified that Ms. Payton was not threatened with being charged with first degree murder and that no one ever told her the facts or any details surrounding the shooting of the victim.

Chicago police officer Hasan Al-Amin testified that on June 20, 1997, he responded to a call of a man wanted for homicide. When Officer Al-Amin arrived at the scene, he saw a man fitting the given description trying to hide underneath a landing. Officer Al-Amin scaled a fence and the man started running. The man ran to the roof of a building and tried to jump off but then stopped. Another police officer ordered the man to stop and lay down and the man was arrested. That man was the defendant.

The evidence also showed that two compact discs and three compact disc cases were removed from the Nissan Pathfinder after the police brought the vehicle in on March 19. A fingerprint on one of the compact discs belonged to the defendant. The defendant's fingerprint was on one of the beer bottles that was in Ms. Payton's apartment on March 19.

The man who was with the victim on the night of the shooting, Charles Jenkins, testified that he was talking on a pay phone next to the victim at the Amoco Station at 75th Street and Yates Boulevard on March 18, 1997, at approximately 11:30 p.m. While he and the victim were on the phones, a truck pulled into the Amoco station and stopped five or six feet away from them. A young man got out of the truck and walked toward them as though he was going to use a pay phone. Jenkins kept turning to look at the man as he approached and he saw the man pull a gun. He watched as the man put the gun to the victim's head and shot him. Jenkins then dropped the phone and started to run through an alley, when he was shot in the back by the same man who shot the victim. At trial he described the shooter as 5 feet 6 inches or 5 feet 7 inches and 160 to 170 pounds. Jenkins testified that the shooter's complexion was darker than his own and that the defendant is not the man who shot him. Jenkins further testified that he was not certain that he could identify the shooter if he saw him again as the scene was chaotic.

In rebuttal, the State called Joseph Adamczyk, a law clerk with the State's Attorney's office. Mr. Adamczyk testified that he was present for an interview with Mr. Jenkins where Jenkins stated he did not see the face of the man who shot him.

The jury convicted defendant of murder, and the trial court sentenced him to 45 years' imprisonment. Defendant filed this timely appeal.

First, defendant contends the State failed to prove him guilty beyond a reasonable doubt where the primary evidence against him was Ms. Payton's statements to police and the grand jury, which she recanted at trial. Upon review, this court does not retry the case but, rather, examines the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

At trial, Ms. Payton denied seeing defendant commit the murder. Ms. Payton's testimony was contrary to her signed statement and her testimony before the grand jury, in which she stated that she had witnessed defendant shoot the victim. Ms. Payton's pretrial statements implicating defendant were admitted as substantive evidence pursuant to section 115—10.1 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 2000)).

■ Section 115—10.1 provides that a prior inconsistent statement made by a witness is admissible as substantive evidence if:

"(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." 725 ILCS 5/115—10.1 (West 2000).

In *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999), this court held that even where there is "no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115—10.1 cannot support a conviction." In *Morrow*, the defendant was indicted for murder and armed robbery. *Morrow*, 303 Ill. App. 3d at 673. A witness implicated the defendant in a pretrial statement to detectives and an assistant State's Attorney and in her testimony before the grand jury.

*Morrow*, 303 Ill. App. 3d at 674. At trial, the witness recanted her pretrial statement and her grand jury testimony. *Morrow*, 303 Ill. App. 3d at 674-75. The jury convicted defendant. The appellate court affirmed, holding:

"[T]he previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt. If a prior statement meets section 115—10.1's test, 'a finding of reliability and voluntariness is automatically made. *** Accordingly, no additional analysis is needed. *** [I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony.' *People v. Pursley*, 284 Ill. App. 3d 597, 609, 672 N.E.2d 1249, 1257 (1996); see also *People v. Carlos*, 275 Ill. App. 3d 80, 84, 655 N.E.2d 1182, 1184 (1995). 'Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may *not* engage in any such analysis.' (Emphasis in original). *People v. Curtis*, 296 Ill. App. 3d at 999, 696 N.E.2d at 378; accord *People v. Zizzo*, 301 Ill. App. 3d 481, 703 N.E.2d 546 (1998)." *Morrow*, 303 Ill. App. 3d at 677.

See also *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002) (citing *Morrow* with approval and holding that convictions may be based solely upon prior inconsistent statements even where there is no corroborating evidence to support the conviction).

There are appellate court cases where a recanted prior inconsistent statement was held insufficient to sustain a conviction. See, *e.g.*, *People v. Parker*, 234 Ill. App. 3d 273 (1992); *People v. Arcos*, 282 Ill. App. 3d 870 (1996). However, in *Zizzo*, this court held that *Parker* and *Arcos* turned on their facts and that they do not establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction. *Zizzo*, 301 Ill. App. 3d at 488-89.

■ In the present case, the jury obviously found Ms. Payton's pretrial statement and grand jury testimony implicating defendant more credible than her trial testimony, and we will not substitute our judgment therefor. Ms. Payton's pretrial statement and grand jury testimony were sufficient to sustain defendant's conviction for murder. The physical evidence also supports defendant's conviction, as his fingerprints were found on a beer bottle in Ms. Payton's apartment as well as on a compact disc in the car that he drove after the murder.

Defendant points to Mr. Jenkins' testimony that he was "positive" that defendant was not the shooter. Elsewhere in Mr. Jenkins' testimony, though, he admitted that he did not get a good look at the shooter's face. It is for the trier of fact to resolve any inconsistencies

in the testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony. *People v. Harris*, 220 Ill. App. 3d 848, 863 (1991). The jury obviously resolved any inconsistencies in favor of the State; we will not substitute our judgment therefor. As discussed, the evidence was sufficient to support the jury's finding of guilt; accordingly, we affirm defendant's conviction.

■ Next, defendant argues that the State made three improper remarks during closing arguments. Defendant waived review by failing to raise the issue in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). On the merits, it is well settled that the prosecutor has wide latitude in making closing remarks and may argue to the jury facts and legitimate inferences drawn from the evidence. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). The prosecutor's argument must be examined in its entirety and the complained-of comments placed in their proper context. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). The style and substance of closing arguments are within the discretion of the trial court and will not be reversed upon appeal absent an abuse of discretion. *Tolliver*, 347 Ill. App. 3d at 224.

First, defendant claims that the prosecutor improperly made a gang reference when he referred to the victim possibly "wearing the wrong colors." We find no error. In context, the prosecutor stated:

"Now, Timothy Jones was 23 years old, and he had pretty much his whole life ahead of him. He was a young man trying to use a pay phone on the city street. And in a split second, in the heat of passion, he lost everything that he was. And he soon laid on the table at the Cook County medical examiner's office. And if he wasn't lying on that hospital bed brain dead after this happened, he would probably be wondering what all of us are probably wondering now. Why? What was it that you did on March 18, 1997, to deserve this? Did he walk the wrong way? Say the wrong thing? Wear the wrong colors? Stand next to the wrong person? What was it that Timothy Jones [did] to deserve this?"

The prosecutor's statement does not convey the message that the murder was gang related. Rather, the message conveyed to the jury was that the murder was a senseless act. There was no error.

Second, defendant contends that the prosecutor misstated the evidence when he argued that Robinson described the shooter to police as "a male black, in his twenties, 5'7 to 5'9, middle to heavy built." We find no error, as Robinson testified that the shooter was a black male, 5 feet 7 inches to 5 feet 9 inches tall and kind of heavyset, and he further testified that he described the shooter to police as "5'9, 5'7, heavy set."

Third, defendant contends that the prosecutor misstated the evidence when he argued that police looked for defendant but he was

careful not to be found in all his "normal places" for three months. Defendant contends that there was no testimony as to his "normal places," nor was there testimony that the police visited such places. Review of the record indicates that Ms. Payton testified to areas frequented by the defendant, such as Stateway Gardens at 36th and Federal Streets; further, police testified that they searched for defendant at Stateway Gardens but were unable to locate him there. Accordingly, the prosecutor's comments accurately reflected the evidence and were not error.

■ Next, defendant argues that the State failed to prove him fit for trial. The prosecution of a defendant who is not fit to stand trial violates due process. *People v. Easley*, 192 Ill. 2d 307, 318 (2000). A defendant is presumed to be fit to stand trial and will be considered unfit only if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *Easley*, 192 Ill. 2d at 318. Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his mind may be otherwise unsound. *Easley*, 192 Ill. 2d at 320.

A defendant is entitled to a fitness hearing only when a *bona fide* doubt of his fitness is raised. *Easley*, 192 Ill. 2d at 318. Once a *bona fide* doubt of fitness is raised, the State bears the burden of establishing defendant's fitness by a preponderance of the evidence. *People v. Griffin*, 178 Ill. 2d 65, 79 (1997). The trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996).

The trial court ordered a fitness hearing for the defendant after trial and prior to sentencing. Doctor Stipes, a psychiatrist, evaluated defendant and found that he was retroactively fit to stand trial and fit for sentencing. Although defendant was on medication at the time of trial, Doctor Stipes stated that the particular medications defendant was receiving had no effect on his fitness. Based upon Doctor Stipes' testimony, the trial court found that defendant was fit at the time of trial and that he was fit for sentencing. The trial court's finding was not against the manifest weight of the evidence.

■ Next, defendant argues that his counsel was ineffective for failing to call certain alibi witnesses who would have testified that defendant was in Milwaukee at the time of the murder. To establish a claim of ineffective assistance, defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability counsel's deficient performance prejudiced defendant. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). A

defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *People v. Palmer*, 162 Ill. 2d 465, 475 (1994). Trial counsel's decision whether to present a particular witness is within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel. *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999).

Martin Kelly, the first chair in defendant's defense team, testified at the motion-for-new-trial hearing that the decision not to present the alibi witnesses was one of trial strategy. Mr. Kelly testified that he felt the defense case was strong even without the alibi witnesses because Jenkins had testified that the shooter was not the defendant and because Ms. Payton had recanted her statement and grand jury testimony against the defendant. Mr. Kelly testified that the alibi witnesses told him that they did not want to testify because they were afraid "other things would come out," specifically, "some past domestic violence issue with [Ms. Payton]." Mr. Kelly further explained that "if the defense puts on an alibi, even though it is not suppose[d] to happen legally, realistically the burden shifts. All of a sudden, the jury is not focused on the reasonable doubt issue of making the State prove their case, but did the defense prove him innocent, if they proved their alibi." Mr. Kelly explained that he wanted the jury "to remain focused on the State's case, and what [he] perceived to be its weakness." Finally, Mr. Kelly stated that he did not want to provide the State the opportunity to call rebuttal witnesses as a result of testimony provided by the alibi witnesses. Mr. Kelly stated that he explained all this to defendant, who agreed not to call the alibi witnesses. The decision not to call the alibi witnesses was objectively reasonable, a matter of trial strategy; accordingly, defendant's claim of ineffective assistance fails.

■ Next, defendant claims that his counsel was ineffective for forcing him to waive his right to testify. Trial counsel stated on the record that they had recommended to the defendant that he not testify, but that the decision was ultimately his. Accordingly, defendant's claim of ineffective assistance fails.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER, J., concurs.

JUSTICE TULLY, dissenting:

I respectfully dissent from the majority opinion affirming defendant's conviction for first degree murder. The majority's conclusion that the evidence was sufficient to support the jury's finding of

guilt is not supported by the record. I would reverse defendant's conviction.

When reviewing a challenge to the sufficiency of evidence, the critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Willer*, 281 Ill. App. 3d 939, 667 N.E.2d 708 (1996). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985).

Here, the only evidence that the defendant was the shooter was the grand jury testimony and written statement of Latonya Payton, which Ms. Payton disavowed at trial. I find this evidence to be so unsatisfactory as to justify reasonable doubt of defendant's guilt. I think the majority fails to conduct a proper analysis of the evidence by relying on the jury's determination of which testimony is credible and simply stating that this court cannot substitute our judgment for that of the jury. I agree that we must accept the jury's determinations of the credibility of a witness. However, our analysis must go further to determine whether that evidence which the jury found to be credible was satisfactory to sustain the conviction beyond a reasonable doubt. In this case, I do not believe that it was.

The majority relies upon *Morrow, Curtis* and *Zizzo* to support the conclusion that a recanted prior inconsistent statement alone is sufficient to sustain a conviction. However, while maintaining that corroborative evidence is not necessary to sustain a conviction, each of these cases notes the corroborative evidence as support in affirming the conviction. In *Zizzo*, the court noted that the witness gave two sworn accounts of defendant's role in the alleged crime, both of which could not be true. The court held that the trier of fact weighed the inconsistent statements, after listening and watching the witness on the stand, and found that his prior testimony was more truthful. The court found nothing in the record to justify the substitution of its judgment for that of the trial court with respect to the witness's credibility. The court found that this statement, *taken together with the discovery of defendant's fingerprint at the crime scene*, was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt. *Zizzo*, 301 Ill. App. 3d 481, 703 N.E.2d 546. Similarly, in *People v. Curtis*, 296 Ill. App. 3d 991, 696 N.E.2d 372, the court found that the trial court weighed the evidence and assessed the witness' testimony and properly could have found that defendant's prior inconsistent statement was more believable than his trial testimony. The *Curtis* court stated that this prior statement, *combined with other*

*physical evidence linking defendant to the crime*, was sufficient to find defendant guilty beyond a reasonable doubt.

The majority does acknowledge cases that have found the evidence insufficient to support a conviction where there is only a disavowed witness statement and no other evidence against a defendant. Without any analysis though, the majority merely states that these cases "turned on their facts" (352 Ill. App. 3d at 80) and do not establish that a recanted prior inconsistent statement cannot support a conviction. I agree that there may be a case where a recanted inconsistent statement alone supports a conviction, but I do not believe this is that case. I believe these cases, summarily dismissed by the majority, support my position that in this case, the evidence is not sufficient to sustain the conviction.

In *People v. Brown*, 303 Ill. App. 3d 949, 709 N.E.2d 609 (1999), the court found that a recanted witness statement alone, with no other evidence against the defendant, was insufficient to support the conviction. After finding that certain witness statements were improperly admitted, the court was left with only one witness's prior statement implicating the defendant in the murder, which the witness disavowed at trial. The *Brown* court reasoned that the only evidence linking the defendant to the victim's murder was a disavowed witness statement. The court noted that there was no physical evidence indicating that the defendant committed the crime. The court found that the recanted testimony alone was insufficient to prove defendant guilty beyond a reasonable doubt.

In *People v. Parker*, 234 Ill. App. 3d 273, 600 N.E.2d 529 (1992), the three eyewitnesses testified that the defendant had not participated in the crime, but their prior inconsistent statements said that he had participated. The court reversed defendant's conviction, finding that the witnesses gave explanations for giving untruthful testimony in their previous statements, indicating their unreliability. This, combined with the complete lack of physical evidence, led the court to conclude that defendant had not been proven guilty beyond a reasonable doubt. See also *People v. Arcos*, 282 Ill. App. 3d 870, 668 N.E.2d 1177 (1996) (the court reversed defendant's conviction since the witness disavowed earlier statement implicating defendant in the murder and there was no corroboration for the earlier statement); *People v. Wise*, 205 Ill. App. 3d 1097, 563 N.E.2d 1057 (1990) (witness disavowed earlier statement that defendant had robbed him, and this combined with complete lack of corroborative evidence rendered the witness's testimony insufficient to sustain the defendant's conviction).

In the instant case, as in *Brown*, *Parker*, *Arcos*, and *Wise*, the only evidence linking defendant to the victim's murder is a recanted wit-

ness statement. Other than Ms. Payton's prior statements, which she recanted at trial, there is no physical evidence indicating that the defendant was the shooter. The majority points to the fingerprints of the defendant on a compact disc case that was recovered from the vehicle used in the shooting. However, the evidence showed that Ms. Payton had the car for five days and there was no testimony as to when the compact disc case was put in the car or that the defendant left his fingerprint on the compact disc case when it was in the car. Even more troubling is the majority noting the fingerprint of the defendant on a beer bottle taken from Ms. Payton's apartment. This evidence merely puts the defendant in Ms. Payton's apartment on March 19, 1997. This evidence does not link the defendant to the crime, and the fact that the majority noted such evidence as "corroborating" raises serious concerns about what the majority relies upon to support this conviction.

Finally, Ms. Payton was questioned by police for more than 24 hours and she gave the police at least eight different stories of what occurred the night of the shooting. Significantly, Payton's grand jury testimony and her statement are contradicted by other eyewitness accounts. The State's witness, L.C. Robinson, testified that he watched as a man got out of the front passenger door of the SUV, walked over to the victim, shot the victim in the head and returned to the vehicle and got in the front passenger door. Payton's recanted testimony was that the defendant was the driver, that the defendant got out of the car, shot the victim, and returned to the car and drove away.

I look at the evidence and see an uncorroborated statement that is inconsistent with other eyewitness accounts; a statement given after more than 24 hours of interrogation; a statement taken after eight other versions were given. I do not find any other evidence against the defendant.

Due to the discrepancies in Ms. Payton's testimony which was recanted and lacked corroborative evidence, I believe that Payton's prior statements, alone, were insufficient to prove defendant guilty beyond a reasonable doubt.

Accordingly, I dissent.