2023 IL App (1st) 211607-U

No. 1-21-1607

Order filed April 13, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 5990 |
| | ) | |
| DON NEAL, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for armed habitual criminal over his contention that he was not proven guilty beyond a reasonable doubt.

¶ 2   Following a jury trial, defendant Don Neal was found guilty of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2020)) and sentenced to eight years in prison. On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt when the testimony of the State's witnesses was vague, impeached, and unbelievable. We affirm.

¶ 3    Defendant was charged by indictment with AHC, unlawful use or possession of a weapon by a felon (UUWF), possession of a stolen firearm, and use of a firearm in the commission of an offense following an incident on March 17, 2020. He was also charged by complaint with aggravated assault. The State proceeded to trial on the AHC and aggravated assault charges, and nol-prossed the remaining counts.

¶ 4    Tezsia Thompson testified that she and defendant, whom she identified in court, had been friends for about 16 years and shared a son. On March 16, 2020, starting at 8 or 9 p.m., she hosted her birthday party at her home in Hazel Crest. Defendant attended. On that date, Thompson did not own a firearm or have a concealed carry license, but did have a Firearm Owners Identification (FOID) card. Shortly after midnight on March 17, 2020, defendant and other guests left. Thompson remained in the kitchen, listening to music and drinking while her children and other family members went to sleep.

¶ 5    At some point, defendant returned and stated that his wife was in labor. Thompson and defendant had upcoming plans to go to a hotel, but defendant wanted to "be there" for his baby. Although defendant was concerned that Thompson might leave him if he did not go to the hotel, Thompson knew about defendant's wife's pregnancy and was not upset. As they spoke, defendant drew a firearm from the pocket of his black zippered sweater and placed it on the kitchen table. Thompson focused on the weapon, because she was scared of firearms and did not know "what the outcome was about to be." Defendant then returned the firearm to his pocket. He drew the firearm a second time, "moved the top of it," and set it on the table again.

¶ 6    Thompson was scared and felt she needed to wake someone up. She told defendant that she would not leave him and asked if they could go to the bathroom. Defendant put the firearm in

his pocket and went to the bathroom. After defendant entered the bathroom, Thompson opened her daughter's bedroom door and told her to get up " 'right now' " so that someone would be awake "if anything was to happen."

¶ 7    Thompson returned to the kitchen and then heard her daughter knocking on the bathroom door, asking to use the bathroom. After defendant exited, her daughter entered the bathroom and then yelled to Thompson to bring her a feminine hygiene product. Thompson did not have one, so she yelled to her sister, who was in the front room, to bring her daughter the product. Thompson's sister complied, then joined Thompson and defendant at the kitchen table. Thompson did not see the firearm after her sister joined them. At one point, defendant stated that he would lay down in the bedroom where Thompson's two youngest daughters were sleeping. Defendant asked Thompson to join him, but she declined, believing that she "probably wasn't coming back out." Defendant wore the sweater into the other room.

¶ 8    Thompson then texted Brandon Frazier, the person who regularly transported her children to daycare and was scheduled to pick them up that morning. She later received a phone call from the police department and stayed on the line until officers arrived and asked where defendant was located. She directed them down the hall. Thompson and her family then followed police instructions to leave the home. Officers later brought Thompson to her bedroom where she saw the same sweater defendant had worn earlier "balled up" on the bed. She told the police the sweater was not hers. When the sweater was lifted, she saw cigarettes, a "blunt," and the same firearm she observed in defendant's possession in the kitchen. She identified the firearm in court.

¶ 9    During cross-examination, Thompson acknowledged she had pending charges for unlawful use of a weapon, namely a firearm, and disorderly conduct, but asserted that the charges would be

dismissed once she completed a "conceal and carry class." Thompson and defendant had an on-and-off romantic relationship and he was married to someone else. Defendant did not live with Thompson, but left possessions at her home.

¶ 10 Thompson told police her birthday party started around 10:30 p.m. During the party, Thompson and defendant drank alcohol, and defendant smoked marijuana. Defendant left, then returned after 15 to 20 minutes and stated that his wife was in labor. Thompson and defendant had a hotel room booked for the next day, but she was not concerned he would cancel or spend less time with her and their child. She was not angry or jealous. When she saw the firearm at approximately 1:30 a.m., she did not call 911, yell, or text anyone. She texted Frazier shortly before 7 a.m. and asked him to call the police if the children did not come outside when he came to collect them. Thompson admitted, however, that the actual text message stated, " 'Please just call the police. Tell them you came to get the girls for day care and they didn't come out.' "

¶ 11 During redirect, Thompson testified that, in the text message, she told Frazier to call the police and tell them that the children did not come out and to request a well-being check rather than call the police herself. She then read the text of the message into the record:

> " 'Okay. Me and the kids and my sis is at home. And a guy is here with a gun. Don't panic. Please just call the police. Tell them you came to get the girls for day care and they didn't come out so you want a well-being check, please.' "[1]

---

[1] A copy of the text exchange, labeled as "People's Exhibit #2," was admitted at trial through the testimony of Hazel Crest police detective Thomas Zalatoris, who retrieved it from Thompson's phone. It is included in the record on appeal.

¶ 12    When Thompson sent the text, Frazier had not yet arrived. However, she wanted him to call the police because she was scared, and believed that her calling the police "in that moment" would escalate the situation and anger defendant.

¶ 13    Frazier testified that he was previously employed at La La's Land of Learning and part of his job was transporting children. On March 17, 2020, he received a text message from Thompson stating that her partner had a firearm and to call the police. He was alarmed and complied.

¶ 14    Hazel Crest police officer Monegan testified that on the morning of March 17, 2020, he responded to a call of a man with a firearm.[2] He entered the residence through the unlocked back door and observed two women at a table. Monegan described the victim—Thompson—as distressed, but calm. After a conversation, he went toward a bedroom. When Monegan reached the door, he called out three or four times, but there was no response. As he waited for backup, he heard the "racking" of a firearm. In his 12 years in the military police and almost 3 years with the Hazel Crest Police Department, he had broken down, cleaned, and reassembled firearms and was familiar with the sound a semiautomatic firearm made when it was racked.

¶ 15    Once other officers arrived, Monegan entered the bedroom. There, he observed defendant, whom he identified in court, with a baby on a bed. Two other beds contained toddlers. Defendant's head was on a pillow and his hands were behind his head under the pillow. Defendant was taken into custody and a pillow fell from the bed. Under the pillow was an orange hoody, and when Monegan picked it up, he felt the "weight" of a firearm and keys. Inside the hoody was a loaded black firearm, which Monegan cleared and inventoried. Monegan used the keys to unlock and start

_____

[2] Officer Monegan's first name is not included in the report of proceedings.

a vehicle that was determined to belong to defendant. The vehicle was towed from Thompson's home at her request.

¶ 16    During cross-examination, Monegan acknowledged that he never saw defendant holding the firearm and that it was not visible when Monegan entered the room. He did not find identification or documents bearing defendant's name when searching the bedroom. Monegan did not observe defendant rack the firearm, but the sound of "metal against metal" meant that a round had been chambered or unchambered. Defendant's eyes were closed when Monegan entered the room.

¶ 17    After defendant was removed from the room, Monegan obtained Thompson's consent to search the house and then recovered the firearm. The police report he authored similarly stated that he obtained consent before searching the house and recovering the firearm. Monegan's report did not state that he found the firearm in a hoody, that the firearm was near a set of keys, and that the keys were tested in a vehicle. He did not document that officers drew their firearms or that there was a round in the firearm's chamber. Monegan was not wearing a body camera, and did not photograph the firearm or the hoody *in situ* on the bed.

¶ 18    During redirect, Monegan testified that immediately after observing the firearm, he cleared it and that not every fact is included in a report; rather, reports are summaries.

¶ 19    The State entered stipulations that the firearm was in operable firing condition, and that defendant was sentenced to qualifying offenses on May 12, 2003, and August 27, 2004.

¶ 20    In closing argument, the State asserted that defendant came to Thompson's home armed with a firearm, that Thompson was scared, and that a firearm was recovered from underneath the pillow where defendant's head rested. The defense responded that while defendant was in the

bedroom, it was not his bedroom, bed, or firearm; only Thompson, who had a pending firearm charge, claimed that he possessed a firearm. Counsel further asserted that Thompson had a "motive to lash out" at defendant as his wife was in labor and Thompson's and defendant's hotel stay would be canceled. Counsel argued that it did not "make a whole lot of sense" for Thompson to wait several hours to seek help. Further, Thompson said defendant had a black hoody, but the firearm was recovered from an orange hoody.

¶ 21    The jury found defendant not guilty of aggravated assault and guilty of AHC.

¶ 22    Defendant filed a motion for a judgment notwithstanding the verdict or for a new trial alleging, relevant here, that there was insufficient evidence that he knowingly possessed a firearm because Thompson was not a credible witness. The court denied defendant a new trial. After argument, the court sentenced defendant to eight years in prison. Defendant filed a motion to reconsider sentence, which was denied.

¶ 23    On appeal, defendant contends that he was not proven guilty of AHC beyond a reasonable doubt when the testimony of the State's witnesses was vague, impeached, and unbelievable. He argues that Thompson had a strong motive to lie, and her actions "defy common sense." Defendant further argues that Monegan's testimony contradicts Thompson's testimony and is "internally inconsistent."

¶ 24    In reviewing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *People v. McLaurin*,

2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 25    To convict defendant of AHC, the State had to prove, in pertinent part, that he possessed a firearm after being convicted of two or more enumerated offenses. See 720 ILCS 5/24-1.7(a) (West 2020). On appeal, defendant challenges only the sufficiency of the evidence proving his possession of a firearm.

¶ 26    Possession may be actual or constructive. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Actual possession is shown by testimony that a defendant had some form of control over the firearm, "such as he had it on his person, tried to conceal it, or was seen to discard it." *Id*.

¶ 27    The testimony of a single witness, if positive and credible, is sufficient to uphold a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Contradictory evidence, minor discrepancies, or inconsistencies related to collateral matters, do not automatically render the totality of a witness's testimony incredible. *People v. Gray*, 2017 IL 120958, ¶ 47; *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. That is true whether the fact finder is considering contradictions or discrepancies within the testimony of a single witness (*Gray*, 2017 IL 120958, ¶ 47), or, as here, comparing one person's account to that of another (*Peoples*, 2015 IL App (1st) 121717, ¶ 67).

¶ 28    Viewed in the light most favorable to the State, there was sufficient evidence from which the trier of fact could have found that defendant actually possessed a firearm. Thompson testified that during a conversation with defendant about their relationship, defendant removed a firearm

from the pocket of his black zippered sweater and placed it on the kitchen table. Later, defendant put the firearm back in his pocket. He drew the firearm a second time, moved its top, and set it down. Defendant then replaced the firearm in his pocket a second time. He later went to the bathroom and bedroom. After defendant was taken into custody, Thompson identified the firearm police recovered in her bedroom as the same firearm defendant had earlier displayed in the kitchen.

¶ 29    Additionally, Monegan testified that when he entered the bedroom, defendant was on the bed with closed eyes. Defendant's head rested on a pillow and his hands were behind his head under the pillow. Monegan recovered an orange hoody, which contained a loaded firearm and keys, from underneath the pillow. Monegan then used the keys recovered with the firearm to unlock a vehicle that was determined to belong to defendant. Thus, the evidence at trial supported a finding that defendant possessed a firearm that he drew from his pocket several times, and which was later recovered from underneath the pillow where his head rested. See *Jones*, 2019 IL App (1st) 170478, ¶ 27.

¶ 30    Defendant, however, contends that Thompson was unworthy of belief. He argues that Thompson's testimony was tainted by her jealousy of his wife and newborn as well as the alcohol she consumed that evening. He further argues that Thompson's failure to tell her family members about the firearm or immediately seek police assistance undermines her credibility and establishes that she was not afraid of defendant.

¶ 31    At trial, Thompson testified that she was involved in a longterm on-and-off romantic relationship with defendant, acknowledged that he was married to someone else, and denied she was upset about defendant's wife's pregnancy. She also explained her reasoning for involving additional family members in the situation; that is, she wanted someone else awake "if anything

was to happen." Thompson explained that she was scared and did not want to escalate the situation or anger defendant, so she texted Frazier in order to discretely obtain police assistance. While defendant also posits that the firearm recovered from Thompson's home belonged to her, and her pending charges gave her a motive to lie about the firearm in order to seek leniency from the State, Thompson denied owning a firearm at the time of the offense. The jury could observe Thompson as she testified, and determine what weight to afford her explanation of her actions. It is not for this court to substitute its judgment for that of the trier of fact as to witness credibility. See *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 32    Defendant further argues that Monegan is unworthy of belief because he testified that the firearm was within an orange hoody, and Thompson testified that defendant placed the firearm in the pocket of a black sweater, and that Monegan's testimony as to the sequence of events leading to the firearm's recovery was inconsistent. The color of the clothing from which the firearm was recovered, and whether Monegan obtained consent before or after conducting the search, did not render the entirety of his testimony incredible. See *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004) (the trier of fact resolves any inconsistencies in a witness's testimony and "is free to accept or reject as much or as little as it pleases" of that testimony). In any event, the jury could also consider Monegan's testimony that he recovered a firearm and keys which unlocked a vehicle belonging to defendant from underneath the pillow where defendant's head rested and his hands were placed. To the extent defendant argues that Thompson and Monegan could not have seen or heard defendant rack the firearm, as a bullet would have been ejected the second time the weapon was racked yet no bullets were recovered, how many times the firearm was racked was collateral to the issue of whether defendant possessed the firearm itself. See *Gray*, 2017 IL 120958, ¶ 47

("where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable").

¶ 33    The jury found Thompson's and Monegan's testimony that defendant possessed a firearm that was recovered from underneath the pillow where his head rested credible, and discounted defendant's theory that Thompson lied in order to punish defendant and obtain consideration from the State in another case. See *People v. Bradford*, 2016 IL 118674, ¶ 12 ("It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts."). Here, the jury found the testimony that defendant possessed a firearm to be credible and rejected inferences to the contrary. This court will not retry a defendant and overturn the jury's credibility determinations simply because the defense claims that its version of events is more credible. See *Peoples*, 2015 IL App (1st) 121717, ¶ 67 (the existence of conflicting evidence at trial does not require the reviewing court to reverse a defendant's conviction).

¶ 34    Ultimately, defendant asks us to reweigh the evidence, draw all inferences in his favor, and reach an opposite conclusion from the jury. This we cannot do. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) ("Testimony may be found insufficient *** only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."). We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Defendant's conviction for AHC is therefore affirmed.

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.