2022 IL App (1st) 190570-U

No. 1-19-0570

Order filed August 12, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 15262 |
| | ) | |
| ROBERT MOORE, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Mikva and Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse defendant's conviction for unlawful use of a weapon by a felon where the evidence was insufficient to show he actually or constructively possessed a firearm.

¶ 2    Following a bench trial, defendant Robert Moore was found guilty of unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) and sentenced to seven years' imprisonment. On appeal, defendant contends the evidence failed to show he had actual or constructive possession of the firearm. For the following reasons, we reverse.

¶ 3    Defendant was charged with 2 counts of possession of a controlled substance with intent to deliver, 11 counts of UUWF, and 2 counts of violating the Firearm Owners Identification Card Act (430 ILCS 65/2(a)(1), 14(c)(3) (West 2016)). Relevant here, two counts for UUWF alleged that defendant, who had a prior conviction for murder, possessed in his own abode a .40-caliber firearm (count IV) containing live rounds (count V).

¶ 4    At trial, Chicago police officer Edwin Utreras testified that, in the afternoon on September 26, 2017, he executed a search warrant with other officers at a rowhouse on the 13000 block of South St. Lawrence Avenue (St. Lawrence residence). Upon arriving, Utreras observed a man, whom he identified in court as defendant, look out the window and then step away. Utreras and the other officers forced entry to the residence. Utreras entered the living room and observed defendant "all the way in the back" exiting a room adjacent to the kitchen. Utreras detained defendant and informed him that the officers had a warrant "for him and for that apartment."

¶ 5    The officers conducted a systematic search of the residence. No one else was present. Utreras searched one of two upstairs bedrooms, which contained a television, a bed, a closet, and some furniture. Utreras opened a dresser and saw the butt of a firearm. He additionally found a digital scale and a pill bottle containing suspect heroin, but at trial was unsure whether those items were from the same drawer as the firearm. Inside the closet, Utreras found a safe, which he opened. The safe contained a "big stack of money" and a red bag containing a Ruger handgun, handgun magazines, boxes of ammunition, and loose rounds. In the bedroom, Utreras also found mail with the name "Robert Moore," that was admitted into evidence as People's Exhibit No. 5. The record

on appeal includes a single undated letter from AARP addressed to "Robert Moore Jr." at a residence on the 5400 block of South Princeton Avenue (Princeton residence).[1]

¶ 6      Following the search, the officers transported defendant to the police station, and Utreras advised defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant agreed to speak. When Utreras asked defendant about "the weapons he had in his apartment," defendant stated that "he needed the guns to protect his children because they were robbing people in the row houses."

¶ 7      On cross-examination, Utreras acknowledged he did not ascertain the lessee of the St. Lawrence residence. Utreras did not know an individual named Karen Carter, but met a woman who came to the residence during the search and claimed to be the leaseholder. The woman was in the living room when Utreras went downstairs after searching the bedroom. No one informed him when the woman arrived, and he did not see her or defendant upstairs. Utreras did not speak with the woman about who owned the firearms and denied that she told him that her godfather owned the firearms.

¶ 8      Defense counsel asked Utreras to review "the documents" recovered from the residence, and Utreras testified that the name on one document was "Robert L. Moore, Sr." Utreras also identified Defense Exhibits Nos. 1 and 2, defendant's driver's license and state identification. Copies of those exhibits, which the defense later entered into evidence, are included in the record on appeal. The driver's license was effective from April 18, 2016, through November 4, 2020, and

---

[1] The physical letter from AARP contained in the record on appeal is not marked with an exhibit number. While questioning Utreras, the State described People's Exhibit No. 5 as "articles of mail." The trial court's impounding order identifies People's Exhibit No. 5 as a "[p]iece of mail" and does not list any other exhibits comprising mail.

the state identification was effective from October 1, 2012, through November 4, 2017. Each lists defendant's name as "Robert L. Moore Jr" and his address as the Princeton residence.

¶ 9      Utreras further testified that the pill bottle containing suspect heroin did not have a name on it. When Utreras entered the residence, he did not see defendant holding anything, and defendant did not have contraband on his person. Defendant did not sign anything indicating he was given the *Miranda* rights, nor did Utreras memorialize defendant's statement. Defendant never admitted to living at the St. Lawrence residence.

¶ 10      Chicago police officer Ron Norway testified that he participated in executing the search warrant. Norway proceeded to the kitchen where Utreras had detained defendant. A room off the kitchen contained a freezer, a chair, household items, and a closet. In the room, Norway also observed two pill bottles containing suspect crack cocaine, narcotics packaging, money, and a digital scale.

¶ 11      On cross-examination, Norway testified he did not go upstairs until 10 to 20 minutes after the search had started. Had anyone besides police officers been on the second floor, Norway would have known because that person would have been brought to the main floor. Norway believed that a woman entered the residence, but he did not interact with her. The pill bottles recovered from the room off the kitchen did not have names on them. Norway never saw defendant in that room, and the items found in that room were not tested for fingerprints.

¶ 12      Chicago police officer Joy McClain testified that she participated in executing the search warrant and saw defendant in the kitchen. McClain immediately went upstairs and determined that no one else was present. Then, she photographed the rooms.

¶ 13    McClain photographed and recovered the pill bottles and suspect narcotics from the room off the kitchen. Upstairs, she photographed the drawers in the bedroom that Utreras searched. Inside the drawers, she recovered a box of bullets, a .40-caliber Springfield Arm handgun, a pill bottle containing suspect heroin, and two digital scales. The handgun had a magazine and live rounds that McClain inventoried. The drawer held an insulin syringe box which she did not recover. McClain identified People's Exhibit 2B as a photograph of items in the drawer. The exhibit, which is included in the record on appeal, depicts a firearm beside a box of insulin syringes with a prescription label dated 2011 naming "ROBERT MOORE" at the Princeton residence. McClain also recovered money from a safe in the room.

¶ 14    McClain next photographed the bedroom closet. Inside the closet, she recovered a red and black bag containing a 9-millimeter Ruger, three empty magazines, and loose rounds. She then recovered mail bearing the name "Robert Moore" from atop the dresser. The address on the mail did not match the address of the residence on the search warrant.

¶ 15    On cross-examination, McClain testified that she did not know Carter and was unaware when a woman arrived at the residence. McClain did not find proof of identification downstairs and never photographed evidence showing that defendant's address was the St. Lawrence residence. She did not see defendant upstairs and did not know who rented the residence.

¶ 16    The State entered a certified copy of defendant's conviction for murder in case number 89 CR 08124. The State also entered a stipulation that, if called, Illinois State Police forensic chemist Kathy Regan would testify that she received three pill bottles recovered in this case. One bottle held a zip-lock bag containing a white powdery substance; a second held 54 zip-lock bags, each containing a white rock-like substance; and a third held 23 zip-lock bags, each containing a white

rock-like substance. The substance in the first pill bottle weighed 0.1 gram and tested positive for heroin. From the second bottle, Regan tested the content of 30 bags, which weighed 5.6 grams and tested positive for cocaine. Regan did not test the content of any bags from the third bottle.

¶ 17    For the defense, defendant's father, Robert Moore Sr. (Robert Sr.) testified that on September 26, 2017, he lived at the Princeton residence with his wife, uncle, and defendant, who had lived there since 2003. Carter had a child with defendant and lived at the St. Lawrence residence. Robert Sr. had been there to visit his grandchild.

¶ 18    Robert Sr. identified a financial document related to a car loan that was addressed to him and found at the St. Lawrence residence.[2] He explained that Carter picks up medication for him and may have picked up the letter when she was at his home. Additionally, Robert Sr. sometimes has documents in his possession when he goes to her home.

¶ 19    Carter testified that she and defendant had a child together. Carter lived at the St. Lawrence residence for over eight years with two of her sons, Kevin and Corey, and her godfather, Terrence Brown, and resided there on the day of the search. The residence had three bedrooms, two upstairs and one downstairs. Carter's 24-year-old son, Kyle, also had access to the residence and sometimes spent the night in either upstairs room. One of the rooms belonged to Carter's younger child and the second was Carter's bedroom. Brown used the downstairs room off the kitchen, which contained an air mattress.

¶ 20    In the afternoon on September 26, 2017, Carter was home alone. Defendant arrived between 2 and 2:30 p.m. He did not have a key, but visited once or twice a week to pick up his

---

[2] Defense counsel asserted that this financial document was "marked as People's Exhibit No. 5." The financial statement is not included in the record on appeal.

son, who finished school around 3 p.m. Carter spoke with defendant and then went upstairs to sleep. Shortly thereafter, she heard banging on her front door and looked out the bedroom window. Her yard was "full of police officers." Carter ran downstairs and the door "flew open." She picked up her dog and police ran past her, to defendant, who was sitting in the kitchen, and ordered him to the ground. The officers asked defendant to produce his identification, and he complied.

¶ 21     An officer instructed Carter to sit on the couch, and a sergeant asked if she knew "anything about some guns or something." When Carter responded that she did not, the sergeant instructed the other officers to "tear up the place." Carter remained on the couch while the officers searched her home. They showed her a firearm, magazines, and drugs that were recovered during the search. She was aware of the firearm and told the officer that Brown had placed it in the residence for protection. The officer had no response and "just walked away." She did not have a bank account, so her savings were stored in a safe in her bedroom. The police did not give her a receipt for the money recovered from the safe.

¶ 22     Carter identified a document as defendant's "mail prescription order."[3] At the time of the search, the document was in her house because Carter ordered and picked up medication for defendant, who did not have a vehicle. She gave defendant his "medication bottles" when he visited his son. Carter also identified "junk mail" that defendant brought to her home, but she did not recall exactly when he brought it over. Carter testified that a photograph of the room off the kitchen did not depict the whole room or Brown's air mattress.

---

[3] Defense counsel asserted that the mail prescription order was "marked as People's Exhibit No. 5." The mail prescription order is not included in the record on appeal.

¶ 23    On cross-examination, Carter testified that defendant never spent the night at her home. She picked up medication for both defendant and Robert Sr. Defendant did not enter her bedroom, and his only possessions in her bedroom were his bottles of pills. Carter identified People's Exhibit No. 16, a photograph of her television and three pill bottles that belonged to defendant. The photograph, which is included in the record on appeal, depicts three pill bottles; the labels on two bottles bear the name "ROBERT MOORE," and one of those labels also includes the handwritten notation, "BEDTIME." The label on the third bottle is illegible because the photograph is unfocused. According to Carter, one bottle contained pills that she had picked up, and the other two were empty and needed to be refilled.

¶ 24    Defendant testified that on September 26, 2017, he lived at the Princeton residence. Defendant's driver's license and state identification, entered into evidence by the defense, reflected that he lived at that address. At the time of the search, his son lived with Carter at the St. Lawrence residence, and defendant visited once or twice a week. Defendant denied staying at Carter's residence and did not have a key. On September 26, 2017, defendant visited Carter's home and she let him in to wait for his son. After a brief conversation, Carter went upstairs, and defendant sat in the kitchen. Defendant then heard banging on the door and saw police officers outside. He remained in the kitchen with his hands visible, and the police "tore down the door" and ran to him.

¶ 25    Defendant produced his identification for the officers, who handcuffed him, searched him, and took him to the police station. Defendant denied speaking with Utreras. Rather, he was placed in a holding cell with three other people, processed, and returned to the cell without speaking with any officers. Defendant denied telling officers that the recovered firearms belonged to him or that he needed them for protection. He further denied that he was given the *Miranda* warnings.

¶ 26    On cross-examination, defendant testified that Carter picked up his medication for him. He did not have a relationship with Carter but went to her home to visit their child. He did not enter her bedroom and did not have a cell phone at the time of the search.

¶ 27    During closing arguments, the State argued, *inter alia*, that the insulin found next to the firearm and bearing defendant's name, the three pill bottles, and "the proof of residency in the mail" recovered from the bedroom together established that Carter's bedroom was "also the defendant's bedroom." The State posited that the "set up" of the three pill bottles was "even more indicative of the fact that [he] live[d] at that residence."

¶ 28    In response, defense counsel emphasized that the pill bottles were "in a picture which you can't see. Those pill bottles weren't brought to court. We can't tell what was in them." Defense counsel argued that the document presented as proof of defendant's residence bore "a different address" than the St. Lawrence residence, and defendant's father testified that defendant lived with him at the Princeton residence since 2003. Moreover, the police did not "find anything on [defendant] except his identifications *** which indicates where he lives."

¶ 29    The court found defendant guilty of UUWF counts IV and V for possession of the .40-caliber handgun and live rounds, respectively, and merged count V into count IV. It acquitted defendant of the remaining charges.

¶ 30    In finding defendant guilty of UUWF, the court stated that it did not find Carter's testimony about being present at the residence credible; instead, the officers credibly testified that defendant was the only person present. The court did not believe that defendant and Carter had no relationship outside of their child. Further, defendant had personal items in the residence and "had far more contact with the St. Lawrence address than [Carter] *** or he testified to." While defendant's mail

was addressed to him at other residences, multiple pieces of that mail were found in the St. Lawrence residence. Further, photographs depicted pill bottles with defendant's name and the phrase "BEDTIME" in the upstairs bedroom of the St. Lawrence residence; the court noted, however, that it could not read the label on the other bottles. The court concluded that the firearm found next to the insulin bearing defendant's name showed beyond a reasonable doubt that defendant was guilty of UUWF. Finally, the court clarified that it was "not considering [defendant's] oral statement as evidence," and elaborated that it "just think[s] the officers do need to take further steps and actions when they are seeking to admit an alleged oral statement of a defendant."

¶ 31    The court denied defendant's motion for a new trial. Following a hearing, the court imposed seven years' imprisonment for UUWF. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 32    On appeal, defendant alleges that the State failed to prove he had actual or constructive possession of the firearm and ammunition where no evidence showed he had the contraband on his person, knowledge of the contraband, or control over the St. Lawrence residence.

¶ 33    On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43) and do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

We will not overturn a conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 34    The trier of fact determines the credibility of witnesses, weighs evidence and draws reasonable inferences therefrom, and resolves any conflicts in the evidence. *Siguenza-Brito*, 235 Ill. 2d at 228.  A trier of fact may accept or reject as much or as little as it pleases of a witness's testimony. *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004). We will not overturn a factfinder's credibility determinations merely because the reviewing court would have decided the case differently. *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004).

¶ 35    To convict defendant of UUWF, the State was required to prove beyond a reasonable doubt that he knowingly possessed a firearm and had been convicted of a felony.[4] 720 ILCS 5/24-1.1(a) (West 2016); *People v. Gonzalez*, 151 Ill. 2d 79, 87 (1992). Defendant does not dispute his prior felony conviction, but argues the State failed to prove he knowingly possessed a firearm in his own abode.

¶ 36    Possession of contraband can be actual or constructive. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Where, as here, the defendant was not found in actual possession of the weapon, the State must show he constructively possessed it. To establish constructive possession, the State must prove that the defendant had knowledge of the contraband and exercised immediate and exclusive control over the area where the contraband was found. *People v. Brown*, 2020 IL 124100,

---

[4] The State charged defendant with possession of a firearm in his own abode. However, section 24-1.1 does not require that the offender possess the firearm "in any particular place or manner." *People v. Gonzalez*, 151 Ill. 2d 79, 87 (1992)). Thus, use of the word "abode" in the charging instrument was mere surplusage. *People v. Adams*, 46 Ill. 2d 200, 204 (1970).

¶ 11. Constructive possession is often proven entirely by circumstantial evidence. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003).

¶ 37    "Knowledge may be shown by evidence of a defendant's acts, declarations, or conduct from which it can be inferred that he knew the contraband existed in the place where it was found." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. The State proves control by establishing that the defendant has the " 'intent and capability to maintain control and dominion' over an item, even if he lacks personal present dominion over it." *Id.* (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)).

¶ 38    A defendant's control over the location where weapons were found supports an inference that he possessed the weapons. *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (citing *McCarter*, 339 Ill. App. 3d at 879. Habitation in the premises where a weapon was discovered is sufficient to prove control. *Spencer*, 2012 IL App (1st) 102094, ¶ 17. " 'Proof of residency in the form of rent receipts, utility bills and clothing in closets is relevant to show the defendant lived on the premises and therefore controlled them.' " *People v. Cunningham*, 309 Ill. App. 3d 824, 828 (1999) (quoting *People v. Lawton*, 253 Ill. App. 3d 144, 147 (1993)). The trier of fact may "rely on reasonable inferences of knowledge and possession, absent other factors that might create a reasonable doubt as to the defendant's guilt." *Spencer*, 2012 IL App (1st) 102094, ¶ 17.

¶ 39    Viewing the evidence in the light most favorable to the State, we cannot say the evidence supports finding that defendant exercised immediate and exclusive control over the area where the .40 caliber handgun was found.

¶ 40    The evidence demonstrated that defendant was downstairs in the St. Lawrence residence when officers entered to execute the search warrant. Defendant was not found with weapons or

contraband on his person. When the officers searched an upstairs bedroom, they recovered two handguns, magazines, and bullets.

¶ 41    Inside the bedroom, the .40 caliber handgun was found next to a box of insulin syringes bearing the name "Robert Moore" and the Princeton address. Pill bottles, depicted in a photograph, similarly bore the name "Robert Moore." That name, however, was also the name of defendant's father. The pill bottles and insulin were not inventoried or introduced as evidence. Mail recovered from the bedroom bore the name "Robert Moore," and was addressed to the Princeton residence, where defendant, Carter, and Robert Sr. testified that defendant lived. Defendant's license and identification card, which were each effective on the date of the search, showed he lived at the Princeton residence.

¶ 42    The State argued extensively at trial that defendant's medication and mail were found at the St. Lawrence residence, which indicated defendant lived there and shared the upstairs bedroom with Carter. While habitation is sufficient to establish control, no other evidence demonstrated that defendant resided at that address, such as the presence of his clothing or other belongings that would be expected to be in his bedroom. See, *e.g.*, *Spencer*, 2012 IL App (1st) 102094, ¶ 18 (finding the defendant constructively possessed ammunition where, among other things, in the same bedroom where the contraband was discovered, police found the defendant's Illinois identification card, listing the address of the house as his residence; a recent letter mailed by the Cook County probation department to the defendant at that address; keys that operated the exterior doors of the house; two photographs depicting the defendant; and men's clothing). No evidence showed that defendant had a key to St. Lawrence residence or was seen upstairs at the residence, and the mail addressed to defendant bore the Princeton residence address. Based on the evidence

presented, we cannot say that the State proved beyond a reasonable doubt that defendant controlled the location where the .40 caliber handgun was found to support a finding that he constructively possessed the firearm.

¶ 43     In reaching this conclusion, we acknowledge that we may affirm the trial court on any basis supported by the record (*People v. Bausch*, 2019 IL App (3d) 170001, ¶ 26), and could therefore consider defendant's alleged oral statement although the trial court did not. Here, defendant's oral statement that he "needed the guns to protect his children" would support his knowledge of the firearm. *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (knowledge may be shown by a defendant's declarations "from which it can be inferred that he knew the contraband existed in the place where it was found"). Our conclusion would remain the same, however, because the State failed to establish the control element of constructive possession. As previously described, the evidence was insufficient to show defendant lived at the St. Lawrence residence or had immediate and exclusive control over the area where the firearm was recovered. Accordingly, his UUWF conviction premised on a theory of constructive possession cannot stand.

¶ 44     For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 45     Reversed.